## STRANAHAN v. COMMISSIONER OF INTERNAL REVENUE.

### No. 5502.

Circuit Court of Appeals, Sixth Circuit.

June 27, 1930.

DENISON, Circuit Judge, dissenting in part.

T. O. Marlar, of Toledo, Ohio (E. J. Marshall and Marshall, Melhorn, Marlar & Martin, all of Toledo, Ohio, on the brief), for petitioner.

J. H. McEvers, of Washington, D. C. (G. A. Youngquist, Asst. Atty. Gen., and Sewall Key, C. M. Charest, and J. S. Franklin, all of Washington, D. C., on the brief), for respondent.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

## MOORMAN, Circuit Judge.

This is a petition to review an order of redetermination entered by the Board of Tax Appeals assessing a deficiency in income taxes against the petitioner for the year 1921 in the amount of $61,744.19. The assessment was based upon disallowances of losses claimed to have been sustained on loans to Clarence E. Earle and to the Jeffery-DeWitt Company.

The Earle loan arose in this way: In 1920 Earle was carrying an account with a brokerage firm on the margin. Among the stocks which he had purchased was stock of the Owens Bottle Company. Earle borrowed securities from petitioner of the approximate value of $125,000 for the purpose of depositing them as additional security on his loans. Petitioner arranged with the brokers to have the account placed in his name, so that the securities would not become liable for stock transactions other than the one involving the Owens Bottle Company stock. This stock continued to fall, and the brokers, insisting upon additional margin, threatened to close out the account if further security was not furnished. The petitioner, desiring to save his securities, purchased the bottle company stock outright at the prevailing market price of $27 a share, and paid the brokers, in addition, about $98,000, the balance due on the account in which that stock was carried. Earle agreed to repay this $98,000 to petitioner within a year with interest, to pay at the end of each month carrying charges on the stock, and to pay any loss that petitioner might sustain from a further decline in the price of it. It was agreed that Earle should have the right to purchase within one year, at $45.57 a share, any or all of the stock that petitioner in the meantime had not sold, and that, if any of it was sold within the year at a price above $27 a share, he should have credit upon his indebtedness for the difference between that price and the price at which it was sold.

Earle became insolvent in the latter part of 1921. The record does not show whether he kept up his payments under his contract with petitioner, or whether any of the stock was sold within the year for which the loss is claimed. Nor does anything appear to indicate that the stock was not sold within a year from the date of the agreement for an amount sufficient to satisfy the indebtedness of $98,000 claimed as a loss.

■ The transaction was similar in its nature to those involved in Seiberling v. Commissioner, 38 F.(2d) 810 (6 C. C. A.). We decided in that case that, if there were losses, they did not come within subsection 4 of section 214 (a) of the Revenue Act of 1918 (40 Stat. 1067), because they were not incurred in trade or business, and, further, that the deductions claimed were not allowable under subsection 7, § 214 (a), of the act because the collateral stock was not sold and losses were not sustained within the taxable year. The reasons given for that decision are controlling here. By paying for the bottle company stock, settling the account in which it was carried, and taking Earle's obligation for the excess over the market price so paid under an agreement that he would pay the interest charges thereon at the end of each month, would pay any loss on the stock if it was sold at less than $27 a share within a year, and should have the right to pay for it at $45.57 a share at any time within a year, or, if any part of it was sold, should be credited upon his indebtedness with the amount for which it was sold

in excess of $27 a share, the petitioner put himself for all legal purposes in the shoes of the broker. He became the creditor of Earle in the place of the broker, holding the bottle company stock as security just as the broker had done. Hence the insolvency of Earle occurring within the year could not effect a loss on the indebtedness, so long as there remained the right of recourse upon the bottle company stock. Nothing, as we have said, appears in the record to show that it was sold within the year, or that taking into account its value as a security there was a definite or final determination that any part of the debt was worthless. Obviously there was no ascertained loss.

The other claim of loss is based upon a note of the Jeffery-DeWitt Company. It is insisted that this note became worthless in part during the taxable year, and that the Commissioner should have allowed a deduction therefor under subsection 7, § 214 (a), of the Revenue Act of 1921. That provision of the act confers a right to a deduction where a debt has been ascertained to be worthless during the taxable year and is charged off the books. It also authorizes the Commissioner to allow a deduction when he is satisfied that the debt is "recoverable only in part." It is contended by the government upon the authority of Williamsport Wire Rope Company v. United States, 277 U. S. 551, 48 S. Ct. 587, 72 L. Ed. 985, and other cases, that this court is without jurisdiction to review the disallowance by the Commissioner and Board of Tax Appeals of a claim recoverable only in part. In the Williamsport Case suit was brought in the Court of Claims to recover an alleged overpayment of taxes because the Commissioner had refused to make a special assessment under section 328 of the Revenue Act of 1918 (40 Stat. 1093). The court was dealing in that case, in part, with the jurisdiction of the Court of Claims, as such, and it held that no jurisdiction had been conferred on that court to determine the matter in issue either by statute ante-dating the Revenue Act of 1918 or by the Revenue Act of June 2, 1924 (section 900, subd. a [26 USCA § 1211 note]), creating the Board of Tax Appeals. As a probable reason for not conferring such jurisdiction the court pointed out that the making of a special assessment under the applicable statute was a matter that called, not only for experience and special knowledge of class problems, but also for the reaching of conclusions upon considerations not susceptible of proof. This consideration, with the language of the statute, led to the conclusion that Congress had intended to give to the decisions of the Commissioner and the Board of Tax Appeals in special assessments, a finality that could not be challenged in the courts "in the absence of fraud or other irregularities."

■ The case at bar presents circumstances distinguishing it from the case just referred to. Power to review the decisions of the Board of Tax Appeals is expressly confided in the Circuit Courts of Appeals and the Court of Appeals of the District of Columbia. 26 USCA § 1226. Furthermore, many of the complexities that are encountered in a special assessment are not presented in the determination of the recoverability in part of a debt. The latter is often as susceptible of proof as entire worthlessness. It is admitted that the Commissioner's decision on this claim was reviewable by the board. We do not construe the permissive form of the authority given him to allow the deduction to be a limitation on the power given to the courts to review the decision of the board thereon, nor do we think any restriction on that power is to be inferred from the Williamsport case or the earlier case of Blair v. Oesterlein Mach. Co., 275 U. S. 220, 48 S. Ct. 87, 72 L. Ed. 249. Clearly there is none in Silberschein v. United States, 266 U. S. 221, 45 S. Ct. 69, 69 L. Ed. 256, and United States v. Williams, 278 U. S. 255, 49 S. Ct. 97, 73 L. Ed. 314, which were rested upon entirely different statutes.

■ Although there is power in the courts to review the action of the board in disallowing a deduction based upon a debt "recoverable only in part," it is clear from the language of the statute that the administrative authorities, the Commissioner and the Board, are given a wider discretion in determining whether such allowances should be made than is given them with respect to debts ascertained "to be worthless and charged off within the taxable year." Deductions of the latter are allowed as a matter of law, but the statute provides as to the former that "when satisfied that a debt is recoverable only in part, the commissioner may allow such a debt to be charged off in part." Thus it would seem that the decisions of the Commissioner and Board in passing on claims of this kind should not be interfered with by the courts unless plainly arbitrary or unreasonable. cf. Lucas v. American Code Co., 280 U. S. 445, 50 S. Ct. 202, 74 L. Ed. 538, and Lucas v. Kansas City Structural

Steel Co., 281 U. S. 264, 50 S. Ct. 263, 74 L. Ed. ——, decided April 14, 1930.

It appears in this case that in November, 1920, the Jeffery-DeWitt Company was adjudged a bankrupt. The total amount of its liabilities as shown by its schedules was $895,909.39, and it listed assets amounting to $802,057.66. Commissioners appointed by the court appraised its assets at $302,518.50. Prior to the adjudication some of the larger creditors of the company, under the direction of the petitioner, formulated a plan to organize a new company and acquire the assets of the old. The object of forming this new company was to supply it with additional capital and carry on the same business that the old company had been engaged in. The petitioner was interested in the continuation of that business because a considerable portion of the product of the old company had been sold to a company which he had organized and was operating. The creditors joining in this plan consented to accept preferred stock in the new company for their claims against the old. Creditors who did not participate in it received payment of their claims in full where the claims were less than $100, and those having claims from $100 to $400 agreed to accept 25 per cent. of their face value. A committee representing the new organization bought the assets of the old at the bankruptcy sale for $150,000, an amount sufficient presumably to satisfy the minor creditors according to the plan of settlement agreed upon. The new company proceeded to issue preferred stock of the par value of $10 a share to the participating creditors of the old company to the extent of the face value of their claims. No stock was acquired by any one except those creditors receiving it in exchange for their claims. The petitioner and the Champion Spark Plug Company, which was organized to promote the sale of the product of the old company, and of which petitioner was president, loaned the new company sufficient funds to enable it to carry on its operations. The first year it operated it reported net earnings in excess of 9 per cent. of its outstanding capital stock. These earnings were put back into the business, but in 1927 it declared a dividend of 6 per cent. The first sale of its stock was made in June, 1923, at $3.50 a share, and the second sale in November of 1923 at $5 a share. It does not appear that any part of the stock which the petitioner received has ever been sold, or what it is worth.

Neither the Commissioner nor the Board of Tax Appeals was satisfied from the foregoing facts that petitioner's debt against the Jeffery-DeWitt Company was recoverable only in part in 1921. It cannot be determined from the evidence what petitioner would have received in a distribution of the assets of that company had its affairs been wound up independently of the reorganization plan. In fact, it was not until after settlement had been made with all creditors of the company, except those participating in the reorganization, that the bankruptcy proceedings were instituted, and it was a part of the plan, as found by the Board of Tax Appeals, to put the company into bankruptcy, for "a nominal sale" of its assets and a "nominal purchase" of them by the creditors' committee "satisfying the requirements of the law." Under these circumstances it cannot be said that the sum which the new company paid for the old represented the true value of the assets sold. The old company had an established business. The market for the product of the reorganized company was already established. It made money from the beginning of its operation. In its bankruptcy schedules the old Company listed assets of practically the same amount as its indebtedness. The Commissioners appointed by the court appraised them, doubtless for the purpose of liquidation, at more than $300,-000.00, and this did not include intangible assets nor the good will of the business as a going concern. There was accordingly no showing by the petitioner of any definite value of these assets, and hence we cannot say that the action of the commissioner was plainly arbitrary.

The order of the Board of Tax Appeals is affirmed.

DENISON, Circuit Judge.

As to the Earle debt I cannot concur. The debt for about $98,000 was charged off during the year; the Board expressly finds that this debt, during the year, had become worthless; that would put the whole matter beyond dispute, except that the findings and opinion of the Board, taken all together, are now by the court interpreted as meaning that the debt could not be so classed because it was secured by some pledge of, or lien upon, some interest in the stock. If there were any such outstanding nominal security, I would think that, in order to qualify or neutralize the finding that the debt was worth nothing, there should have been a finding that the security was worth something, and there is no such finding; there is nothing in the record to indicate that the stock, after October

1st and during the year, or ever, was worth a cent more than Stranahan's additional investment at that time. However, passing this question of burden of proof, and coming to the merits: We have Stranahan's old and liquidated loss, about $98,000, which with interest, had become Earle's debt and was to be evidenced by his note. We also have Stranahan's new investment of $141,500. Bearing some relation to both, we have Stranahan's promise to Earle that if, within the year and before Stranahan had received an acceptable offer from some one else, Earl should make or procure an offer of more than $141,500, Stranahan would accept and would apply the surplus on Earle's old debt. Earl incurred no obligation to buy at any price, and made no promise to pay Stranahan all or any part of this $141,500. His promise to indemnify Stranahan against additional fall in price does not involve liability for any part of the price already paid, $141,500; it was a guaranty, not a debt. Earle ddi agree to pay the "cost of carrying" while the option remained. This means the interest which Stranahan must pay at some expected rate on $141,500, less dividends that would be received on the stock. The parties estimated that this net cost, above dividends, might not exceed $300 per month. This amount Earle agreed to pay monthly, and if there was any excess cost of carrying, to pay that excess on demand. In these two features, separately or collectively—Earle's promise to indemnify for additional loss, and Earle's promise to pay carrying charges—I cannot see any indication that the stock was security for the old debt.

Nor otherwise can I see that the stock was held in any sense as collateral to the old $98,000 debt. To say that it was seems to me to confuse the obligation of a promisor and the privilege of an optionee. Earle had no equity of redemption, nor any analogous right; he had no interest at all; he had an option to earn an interest.

I think it not correct to say that Stranahan was merely substituted for the brokers. As to the old debt, he was; as to the new purchase he was not, for the broker had been Earle's creditor in this amount and Stranahan was not, and did not become so. I think Stranahan suffered the loss of this old debt, which became worthless, and that, if later, he should sell the stock to Earle or some one else, for a profit over the $141,500, he should account for that as a gain in the year when it accrued.