ART METAL CONST. CO. v. UNITED
STATES.

Nos. 42493, 42548.

Court of Claims.

Jan. 11, 1937.

¹ Set up out of surplus $21,597.78.

860

William P. Smith, of Washington, D. C., for plaintiff.

John W. Hussey, of Washington, D. C., and Robert H. Jackson, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

LITTLETON, Judge.

These two cases were consolidated for the purpose of taking testimony and submission to the court, and arise as a result of adverse action by the Commissioner of Internal Revenue on timely refund claims filed by plaintiff for income tax alleged to have been overpaid for 1927, 1929, and 1930.

Plaintiff contends, first, that a corporation later affiliated with it sustained a

loss in 1927 on the disposition of certain patents, the unabsorbed portion of which should be carried forward and allowed as a deduction in computing consolidated net income for 1929. This question presents a rather involved set of facts but the essential elements upon which recovery depends involve a very narrow question of fact. Prior to 1911 one Quigley was developing a device called a costmeter, which was designed to record information necessary in the determination of labor and overhead cost in factories. In 1911 J. C. Liggett, after conferences with Quigley, became convinced that the device had commercial possibilities. Accordingly, September 28, 1911, Liggett organized the Costmeter Company of California and to that corporation were transferred the patents and patent applications on the costmeter device. In the meantime Liggett had interested his brother, L. K. Liggett, and perhaps others, in the proposition. The corporation had outstanding capital stock of the par value of $500,000, most, if not all, of which was held by the Liggetts, Quigley, and their families, more than three-fourths of the stock being held by the Liggetts of which more than a majority was held by L. K. Liggett. From 1911 to 1915 considerable experimental work was carried on for the purpose of perfecting the device.

In November, 1914, the Costmeter Company of Massachusetts was organized and to that corporation were transferred in October, 1915, all of the assets of the California corporation in exchange for stock of a par value of $300,000. The stock was apportioned among the stockholders of the California corporation on the basis of their holdings in that corporation. The Massachusetts corporation also assumed liabilities of the California corporation of approximately $49,000, and, in addition to the patents and the patent applications on the costmeter device, acquired certain miscellaneous assets having a value of seventeen or eighteen thousand dollars. The patents and patent applications were entered on the books of the Massachusetts corporation at $331,696.80, which that corporation used as cost based upon the par value of stock issued for the various assets and the liabilities assumed. About the same time the California corporation sold stock of a par value of $40,000 for cash in the same amount to three individuals who had not been previously connected with either corporation.

The Massachusetts corporation then proceeded to manufacture some of the devices and at the same time continued its experimental and development work looking to its improvement and perfection. From time to time over the period from 1915 to 1920 machines were manufactured and placed with about six business concerns for use on a rental basis of 50 cents a month. The device was never a commercial success, losses being shown consistently in connection with the venture. In 1920 all manufacture of the device under the patents ceased and none was thereafter manufactured.

In the meantime a patent on a visible file index, which came to the Massachusetts corporation through a patent application in existence at the time of the 1915 transfer of assets, had developed into an asset of value. In 1922 it was decided to transfer the visible file index business to a separate corporation. Accordingly the Postindex Company was formed September 15, 1922, to which were transferred the patent on the visible file index and all other assets of the Costmeter Company of Massachusetts except the costmeter patents and inventory, the entire capital stock of the Postindex Company being issued to the Costmeter Company of Massachusetts. The Postindex Company seems to have been profitable from 1922 to 1925, whereas in or before 1925 the costmeter business had become a hopeless venture. However, the Costmeter Company had become indebted to the Postindex Company, as well as to L. K. Liggett. As a result the Costmeter Company on December 30, 1925, transferred the costmeter patents and inventory to the Postindex Company in settlement of its indebtedness to the latter corporation and on the same day the Costmeter Company transferred all of the stock of the Postindex Company to L. K. Liggett in settlement of its indebtedness to him. Having thus disposed of all its assets the Costmeter Company liquidated on the following day. L. K. Liggett continued to own all the stock of the Postindex Company from December 30, 1925, until February 9, 1927, when he sold this stock to plaintiff. Two days before this sale the Postindex Company sold the costmeter patents to L. K. Liggett for, $100.

On the basis of this sale of the costmeter patents in 1927 by the Postindex Company to L. K. Liggett plaintiff claims a deductible loss measured by the difference between the alleged cost of $331,696.-

80, as entered on the books of the Costmeter Company of Massachusetts in 1915, less proper adjustment for depreciation, and the sale price of $100 in 1927. On this basis plaintiff also contends such part of the loss as was not used in determining taxable income for 1927 and 1928 should be carried forward and allowed as a deduction in computing net income for 1929. On the latter point the parties agree that in the event a loss was sustained plaintiff is correct in principle as to carrying forward such loss.

Plaintiff proceeds on the theory that these patents were acquired in 1915 at a cost measured by the par value of stock issued therefor and certain liabilities assumed, and that such stock had a fair market value equal to its par value. This claim is based largely on the proposition that certain shares of stock were sold for cash at par about the date of acquisition in 1915, whereas defendant strongly urges that the evidence is not sufficient to support the claimed value.

We do not find it necessary to determine the merits of these contentions for the reason that we are convinced, and have found as a fact, that the patents had become worthless long before the taxable years involved. This conclusion is fully supported by the record. However optimistic the views of the promoters of the enterprise may have been at its inception, these hopes had been destroyed prior to the time when the Costmeter Company of California made a transfer of the assets to the Postindex Company on December 30, 1925. After about five years of effort had produced gross income from the device of only about $14,000, and the corporation had shown consistent losses therefrom over that entire period, manufacture ceased in 1920 and was not thereafter resumed. Whether the invention might have been a success if the war had not intervened and if better methods of doing the same thing had not been found is of no importance here. The controlling fact is that five years of effort, in addition to about five years of experimentation prior to the formation of the Costmeter Company of California, not only failed to produce successful results but demonstrated that financial returns could not be expected from the manufacture of this device.

The conclusion of the Costmeter Company of Massachusetts that the patents were worthless prior to their transfer to the Postindex Company is shown by statements appearing in the capital stock returns filed July 21, 1923, September 29, 1924, and July 24, 1925, wherein it is said that "The inventory is obsolete," and "Good will and patents have no value in view of the recurring deficits." The overwhelming weight of evidence to the effect that the patents had become worthless prior to December 30, 1925, more properly fixes the period within which any deductible loss was sustained than the sale in 1927 of the asset in question by a corporation to its sole stockholder for a nominal consideration. Since the loss had been sustained prior to 1927 it follows that it cannot be taken into consideration in arriving at taxable income for 1927 and subsequent years.

Plaintiff next contends that the defendant erroneously reduced the amount of the allowable deductions in 1927 and 1930 on account of additions to its reserve for bad debts. This issue arises under the provisions of section 234 (a) (5) of the Revenue Act of 1926, 44 Stat. 41, and the corresponding provision of the Revenue Act of 1928, § 23 (j), 26 U.S.C.A. § 23 note, which provide that in computing net income there shall be allowed as deductions "Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts)."

The use of the reserve system in connection with deductions for worthless debts was first permitted in the Revenue Act of 1921 (section 234(a) (5), 42 Stat. 254) and has been continued in substantially the same form. Prior to 1921 deductions for worthless debts could only be allowed when they were ascertained to be worthless and charged off. The new provision for the use of reserves constituted an important departure from the former revenue acts as far as worthless debts were concerned, and also a departure from the method employed with respect to other deductions, in that, by the use of the reserve method, deductions were thereafter allowable without regard to whether evidenced by closed and completed transactions. It is not without significance, therefore, that under the quoted provisions the additions to the reserve must be reasonable and allowable only in the discretion of the Commissioner. While the Commissioner's exercise of his discretion in this respect is subject to review (cf. Blair v. Oesterlein Machine Co., 275 U.S. 220, 48 S.Ct. 87, 72 L.Ed. 249), his determination of a reasonable addition to a

reserve is not to be lightly set aside. The burden is on plaintiff to show that the additions which the Commissioner has allowed to the reserve as deductions from income for the years involved are not reasonable. In this there is more than a mere presumption of the correctness of the Commissioner's determination. In addition, we are reviewing exercised discretion which has been confided in the Commissioner. Upon these principles we cannot say, upon this record, that there was any abuse of the discretion lodged in the Commissioner in the determination and allowance as a deduction of the additions to the reserves for 1927 and 1930, or that the additions for those years were other than reasonable. It is true that the addition allowed by the Commissioner for each of the three years preceding 1927, as well as for each of the three subsequent years, was $20,000, whereas the amount allowed for 1927 was only $11,680.38. Each year, however, must be judged on its own particular facts and an allowance by the Commissioner for a prior year does not bind him to approve the same allowance for a later year. C. P. Ford & Company, Inc., v. Commissioner, 28 B.T.A. 156. The addition to the reserve claimed by plaintiff for 1927 was $38,591.82, whereas the total amount charged off by plaintiff from 1921 to 1927, inclusive, amounted to only $54,-387.97, or an average of $7,769.71 a year, and that does not take into account the amounts recovered in each of the years on account of debts previously charged off. The balance in the reserve as fixed by plaintiff at December 31, 1927, was $177,114.51, an amount more than three times the total charge-offs for 1921 to 1927, inclusive. When, therefore, the Commissioner allowed an addition for 1927 of $11,680.38 and showed a balance in the reserve at December 31, 1927, of $84,171.28, a showing of unusual circumstances would be necessary to require a conclusion that the Commissioner had abused his discretion in making such allowance and that a reasonable addition to the reserve had not been made. The evidence fails to justify such a conclusion.

■ A similar analysis could be made with respect to 1930 and a like conclusion must be reached. In further support of its position with respect to the latter year, with respect to which the Commissioner allowed an addition to the reserve of $20,000 when the charge-offs in that year were $28,145.-33, plaintiff calls attention to the unusual conditions brought about by the economic depression and states that the losses sus-tained in the three subsequent years substantiate its contention. Although what happened in those three years would not be controlling as to the proper addition in 1930 and we have not considered the facts with respect thereto sufficiently material to be incorporated in the findings, what was shown, however, tends to confirm rather than refute the accuracy of the allowance as made by the Commissioner. The actual charge-offs for 1931, 1932, and 1933 were $13,941, $53,049.03, and $23,204.-27, respectively. Even after these charge-offs a substantial amount existed in the reserve at the end of 1933 and a substantial part of the charge-offs was with respect to business done for 1930 and prior years, as to which years reserves had been built up, even on the Commissioner's allowance, much in excess of the charge-offs for those years. The further argument is advanced that the plaintiff was not always fully protected through the character of bonds taken out by the party through whom it was doing work, but it should be borne in mind that protection of this character is something in addition to that ordinarily found to which a party may have recourse in the event of the failure of the debtor. In many instances, therefore, plaintiff had double protection against bad-debt losses and the relatively small losses sustained of that nature may reasonably be attributed in part to that source.

The record we think confirms rather than discredits the reasonableness of the additions to the reserve as allowed by the Commissioner of Internal Revenue.

■ The final question is whether plaintiff is entitled to a credit against its tax for the calendar year 1930 on account of income tax paid to the British government February 5, 1932; on earnings of its London branch for that year. Plaintiff kept its books and rendered its returns on an accrual basis and contends that the tax in question accrued at the end of 1930. The meager facts on this point are not sufficient to justify the conclusion that the taxes accrued on a date other than that fixed by the Commissioner. In order to substantiate credits for foreign taxes, it is necessary to prove the details of the law imposing the tax as well as the various factors fixing the date of accrual. Niles Bement Pond Co. v. United States, 281 U. S. 357, 50 S.Ct. 251, 74 L.Ed. 901; Law of Federal Income Taxation, Paul and Mertens, vol. 3, p. 212. Some of these essential elements are not shown. Accepting

as true, however, the facts as used by both parties, some of which are not in the record, we are of opinion that the Commissioner's action was correct.

Prior to 1932 the Commissioner had proceeded on his ruling that British income tax assessable for the British year of assessment, April 6 to April 5 of the succeeding year, on the average income of "three years ending on that day of the year immediately preceding the year of assessment on which the accounts of the said trade had been usually made up," is properly accruable as at the end of the third year in the average, and where the tax for the British year of assessment is based on the income of the preceding year, the tax accrues as at the end of such preceding year. G.C.M.5971 (C.B. VIII–1, p. 182). However, on February 4, 1932, it was held in Columbian Carbon Co. v. Commissioner, 25 B.T.A. 456, that such tax did not accrue at the end of the year preceding the year of assessment, but rather in the year of assessment, since it appeared that liability for the payment of such British taxes is dependent upon whether the taxpayer continues in business during the year of assessment. As a result of that decision, the Commissioner revoked the prior decision referred to and issued G.C.M.10613 (C.B. XI–1, p. 173), in which he made a ruling consistent with that decision of the Board.

Plaintiff filed its return for 1930 on the basis of the earlier decision, but in his audit the Commissioner made adjustments to conform to the later decision which was then in force, thereby disallowing the entire deduction for 1930 of the tax for the British year of assessment, April 6, 1931, to April 5, 1932, which was based on the earnings of plaintiff's London branch for the calendar year ended December 31, 1930, and which was paid February 4, 1932.

A tax accrues when all events have occurred which fix the amount of tax and determine the liability of the taxpayer to pay it. United States v. Anderson, 269 U.S. 422, 423, 46 S.Ct. 131, 70 L.Ed. 347. On the basis of the facts set out in the decision of the Board in the Columbian Carbon Co. Case, supra, and in the rulings of the Commissioner heretofore referred to, which facts the parties seem to have accepted as a basis for their positions, it appears that at the end of 1930 all events had occurred necessary for a determination of the amount of tax but that plaintiff's liability for tax was dependent on the happening of an event subsequent to the end of that year, namely, its continuance in business. Under such circumstances the basis for accrual did not exist until after the end of the calendar year 1930. The petitions must be dismissed. It is so ordered.