**MAVERICK–CLARKE LITHO CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 12857.

United States Court of Appeals
Fifth Circuit.
March 11, 1950.

**588**

Leroy G. Denman, Jr., San Antonio, Tex., Leroy G. Denman, San Antonio, Tex., for petitioner.

George D. Webster, Sp. Asst. to Atty. Gen., Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., A. F. Prescott, Sp. Asst. to Atty. Gen., S. Dee Hanson, Sp. Asst. to Atty. Gen., Charles Oliphant, Ch. Cnsl., Claude R. Marshall, Sp. Atty., Bur. Int. Rev., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and WALLER and BORAH, Circuit Judges.

BORAH, Circuit Judge.

This appeal from the Tax Court involves deficiencies in corporate excess profits taxes for the taxable years 1942 and 1943. The questions here are whether the Tax Court erred: (1) in sustaining the Commissioner's refusal to allow as additional equity invested capital the increase of $125,000 in petitioner's capital stock in the year 1917 and (2) in sustaining the Commissioner's disallowance as deductions certain additions made by petitioner to his bad debt reserve in the years 1942 and 1943. These questions will be considered *seriatim* in the light of the facts as found by the Tax Court.

The petitioner is a Texas corporation engaged in the business of printing, lithographing and selling stationery and office equipment. Immediately prior to November 20, 1917 its capital stock outstanding consisted of 750 shares each of the par value of $100. These shares were then held by five shareholder-directors.[1] At a meeting of the stockholders held at 12:30 P.M. on November 20, 1917 it was unanimously decided to increase the capital stock of the corporation from $75,000 to $200,000, the additional stock increase to be divided into shares of $100 each, amounting to 1250 shares; to recall and cancel the old stock certificates and issue new stock certificates therefor and to issue certificates for the new stock. The stockholders instructed the Board of Directors to take all necessary steps for the purpose of increasing the capital stock and to take subscriptions and make such dispositions of the stock as would be beneficial to the corporation. At 1:00 P.M. that day the same persons again met but this time in their capacity as directors of the corporation. As directors they decided to divide ratably among the shareholders the surplus profits of petitioner amounting to $125,000.00. At the same time it was agreed, in pursuance to the direction given by the stockholders, to increase the capital stock to $200,000.00 by the issuance of an additional 1250 shares

---

1. At that time shares were held as follows:

| | |
|---|---|
| W. E. Milligan | 205 shares |
| Pauline Milligan | 256 shares |
| Alice Milligan | 5 shares |
| Ned McIlhenny | 173 shares |
| I. M. McIlhenny | 111 shares |

of the par value of $100 each; and to recall the $75,000 outstanding stock and issue new stock certificates therefor "in accordance with the amount of shares of stock to each holder respectively." The president of the corporation then presented to the board of directors a statement from the stockholders agreeing to subscribe and pay for the additional 1250 shares of stock. Whereupon it was moved and seconded that the additional 1250 shares be sold and issued to the then stockholders in the proportion and amounts subscribed and that the respective shares of profits now due and owing them by petitioner be applied to the payment of said respective shares of stock; and that new certificates for the $75,000 outstanding stock be issued in accordance with the amount of shares of stock of each holder respectively upon receipt and cancellation of the old stock. An agreement was then entered into between the corporation and stockholders under the terms of which each stockholder agreed to subscribe for his proportional shares of the increased capital stock; to accept the undivided property dividends in lieu of a cash dividend; and to reassign and re-convey their respective interests in the undivided property dividends to petitioner in payment of their respective stock subscriptions to the increased capital stock. The corporation in turn accepted the subscriptions and agreed to the payment of same as above set out. The proceedings of November 20, 1917 were then certified to the Secretary of State of the State of Texas.

The petitioner had an earned surplus of not less than $125,000 immediately prior to November 20, 1917, which amount was transferred from surplus to capital at that time.

In its income and excess profits tax return covering November 1917 and in its claim for abatement of taxes for the years 1917 through 1920 petitioner described the 1917 increase in capital stock as a stock dividend. The Tax Court found as a fact that the stockholders and directors did not intend that the petitioner should pay a cash or property dividend, and that no property was paid in for the stock issued on November 20, 1917. Such findings of fact by the Tax Court are not to be disturbed on review unless "clearly erroneous".[2]

The petitioner contends that the increase of $125,000.00 in its capital stock in 1917 constituted additional paid-in capital within the meaning of section 718(a) of the Internal Revenue Code, 26 U.S.C.A. § 718 (a). And in support of this contention petitioner urges that the declaration of a dividend in undivided property by the directors of the corporation created a debtor-creditor relationship between the corporation and its stockholders; that the execution of the subscription agreement by the stockholders to take new stock created a definite legal obligation on their part to the corporation; and that the acceptance of such dividend by the stockholders and reassignment by them of the dividend to the corporation in payment for the new stock constituted either an actual or a constructive distribution of the surplus and a reinvestment of it in the corporation. Further, that such a distribution was not a stock dividend but represented money or property paid in for new stock within the meaning of section 718(a) (1) or (2) of the Internal Revenue Code. In the alternative and in the event it is held that it was a stock distribution petitioner contends that the declaration of a dividend in undivided property followed by an election by the stockholders to accept stock rather than property resulted in a distribution of stock which is includible in equity invested capital under Section 718(a) (3) (A) of the Code.

On the other hand the respondent contends, and the Tax Court found, that the increase in capital stock in 1917 claimed as equity invested capital for the taxable years resulted from the taxpayers distribution of a *pro rata* stock dividend of common on common stock to the stockholders, which was not a distribution out of earnings and profits taxable to the distributees; and that the taxpayer had failed to prove that any property was paid in to the corporation by

**2.** United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

the stockholders in exchange for their new stock, as well as the basis for loss of any property in the hands of anyone; and in the absence of a showing that these findings were in anywise erroneous petitioner is not entitled to the equity invested capital claimed. We agree with respondent.

■ To sustain its contention it was incumbent on petitioner to show that property or money was paid in for stock or that there was a distribution in stock which would be considered a distribution of earnings and profits;[3] and if relying upon property paid in for stock it would further have to show the basis of the property for loss to the person paying it in.[4]

The petitioner does not claim that any money was paid in for the stock or that any money was distributed by the corporation on November 20, 1917, and it admits that there was insufficient cash to pay the dividends in question and that it did not make or have any plans for obtaining money for such purposes. It therefore remained for the petitioner to show that property was paid in for the new stock, as well as the basis of the property for loss purposes to the person who paid it in.

The showing made by petitioner in support of its contention that there was a declaration and distribution of an undivided property dividend was bottomed upon various statements in the resolutions and the stock subscription agreement. And, as the Tax Court held, there was a complete failure of proof in respect of the requisite statutory basis of the undivided property allegedly paid in for stock and claimed as equity invested capital under the provisions of Section 718(a) (2).

■ The Tax Court rightly looked through the form of the transactions to

---

3. 26 U.S.C.A. § 718, as added by Sec. 201 of the Second Revenue Act of 1940, c. 757, 54 Stat. 975.

"Equity invested capital.

"(a) *Definition.* The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

"(1) *Money Paid In.* Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital;

"(2) (As amended by Sec. 218 of the Revenue Act of 1942, supra) *property paid in.* Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. If the property was disposed of before such taxable year, such basis shall be determined under the law applicable to the year of disposition, but without regard to the value of the property as of March 1, 1913. If the property was disposed of before March 1, 1913, its basis shall be considered to be its fair market value at the time paid in. If the unadjusted basis of the property is a substituted basis, such basis shall be adjusted, with respect to the period before the property was paid in, by an amount equal to the adjustments proper under section 115 (*l*) for determining earnings and profits;

"(3) *Distributions in stock.* Distributions in stock—

"(A) Made prior to such taxable year to the extent to which they are considered distributions of earnings and profits; and

"(B) Previously made during such taxable year to the extent to which they are considered distributions of earnings and profits other than earnings and profits of such taxable year;

"(4) *Earnings and profits at beginning of year.* The accumulated earnings and profits as of the beginning of such taxable year;

\*   \*   \*   \*   \*   \*   \*

"(c) *Rules for application of subsections* (a) *and* (b). For the purposes of subsections (a) and (b)—

"(1) *Distributions to shareholders.* The term 'distribution' means a distribution by a corporation to its shareholders, and the term 'distribution in stock' means a distribution by a corporation in its stock or rights to acquire its stock. To the extent that a distribution in stock is not considered a distribution of earnings and profits it shall not be considered a distribution. A distribution in stock shall not be regarded as money or property paid in for stock, or as paid-in surplus, or as a contribution to capital."

4. Section 115 (h) (1) and (2) of the Internal Revenue Code, 26 U.S.C.A. § 115.

ascertain what actually took place and found that the corporation in fact distributed nothing except common on common stock. While the minutes of the meetings of the directors and stockholders show that the directors went through the form of dividing surplus property among the stockholders and that the shareholders in turn agreed to accept the undivided property dividends and to reassign their interests to the corporation in payment of their stock subscriptions, it cannot be said that these formal documents are in and of themselves convincing proof of a real distribution. The Tax Court was not compelled to close its eyes to the true character of the transaction.[5] It is reasonable to conclude from the entire record, as did the Tax Court, that all of the transactions of November 20, 1917 were but steps in an integrated plan agreed to in advance and that the five interested persons had no intention of having the petitioner pay a cash or a genuine property dividend, but intended only to capitalize the surplus and undivided profits in so far as possible, to the end that the surplus earnings would remain in the corporation. Such capitalization of surplus and undivided profits is, of course, the very essence of a stock dividend and is not considered a distribution of earnings and profit.[6] The action was nothing other than a *pro rata* stock dividend of common stock to common shareholders, which was not a distribution out of earnings and profits taxable to the distributees. Upon completion of the entire transaction the petitioner and its stockholders, except for the book transfer from surplus to capital and the issuance of new stock, stood exactly where they were in the beginning. Nothing was added to the interests of the stockholders, the taxpayer's property was not diminished, and the proportional interest of each shareholder remained the same. The Commissioner's determination that this transaction did not affect equity invested capital is not without support in the evidence. These conclusions effectively dispose of petitioner's alternative contention.

There remains for determination the question involving the reserve for bad debts. In the year 1942 the petitioner claimed a deduction of $2,926.69 as an addition to its bad debt reserve, of which amount the Commissioner disallowed the sum of $2,359.15; and in 1943, out of a claimed deduction of $2,155.51 as an addition to the reserve the Commissioner disallowed the amount of $2,339.16.

A schedule showing the bad debt history of the account from the year 1926 through 1943 is too extensive to be set forth in full, however the material portions may be summarized as follows: From the beginning in 1926 and continuing into the early 1930s annual sales were between four and six hundred thousand dollars, but dropped off to between two and three hundred thousand dollars during the depression years 1932–1934. Thereafter the sales gradually increased, reaching over a million dollars in the years 1942 and 1943. In 1927 the corporation commenced the practice of setting aside in the bad debt reserve each month $1\frac{1}{2}\%$ of the total monthly sales, though $90\%$ to $95\%$ were credit sales. Except for the year 1934, when petitioner increased the per cent from $1\frac{1}{2}\%$ to $2\%$, the company continued up to 1948 to deduct $1\frac{1}{2}\%$ per month of the total sales each month. In 1931, due to economic conditions prevailing at that time, the account showed a debit balance of $18,039.00. Following this period charges to bad debt reserve returned to more normal figures and in 1940 the account had a credit balance of $5,653.00, in 1941 a balance of $7,100.00, in 1942 a balance of $9,459.00, and in 1943 a balance of $11,798.00. During this period accounts receivable were: $123,693.00 in 1940, $101,817.00 in 1941, $111,516.00 in 1942 and $115,280.00 in 1943. In other words, in the three year period 1941 to 1943 inclusive accounts receivable decreased $6.8\%$ but reserve for bad debts increased $108.7\%$. Mr. Hill, a witness for petitioner, testified that the totals during this period were increased because of many new accounts, and the possibility of flood and wartime bomb loss,

5. Jackson v. Commissioner, 3 Cir., 51 F.2d 650.

6. Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, 9 A.L.R. 1570; Helvering v. Griffiths, 318 U.S. 317, 63 S.Ct. 636, 87 L.Ed. 843.

but no showing was made of any doubtful accounts necessitating such increase.

The Tax Court found that the Commissioner obviously erred as to the 1943 amount in adding back to income more than the corporation claimed as a deduction. And after carefully reviewing the evidence it reached the conclusion that the Commissioner did not err in disallowing $2,359.15 of the deduction claimed for 1942 and in disallowing the entire deduction claimed for 1943, basing its opinion on the ground that the history of the reserve showed the amounts claimed were not necessary as additions thereto.

The Commissioner, under the applicable statute,[7] was vested with a discretion in determining what constituted a reasonable addition to a reserve for bad debts and his determination is entitled to more than a mere presumption of correctness. The burden was on petitioner to show that the Commissioner abused his discretion and its proof falls far short of meeting that heavy burden.[8]

The decision of the Tax Court is affirmed.

7. 26 U.S.C.A. § 23 (k) (1).

8. United States v. Beckman, 3 Cir., 104 F.2d 260, certiorari denied, sub nom.

Doty v. United States, 308 U.S. 593, 60 S.Ct. 123, 84 L.Ed. 496; Art Metal Construction Co. v. United States, 84 Ct.Cl. 312, 17 F.Supp. 854, 863.