### GEORGE E. WARREN CORPORATION
v.
### The UNITED STATES.
No. 202-53.

United States Court of Claims.
June 5, 1956.

Robert P. Smith, Washington, D. C., for plaintiff. Robert V. Smith, Joseph W. Kiernan, Washington, D. C., D. A. Baker, Chicago, Ill., and Smith, Ristig & Smith, Washington, D. C., were on the briefs.

Jerome Fink, Washington, D. C., with whom was H. Brian Holland, Asst. Atty. Gen., for defendant. Andrew D. Sharpe, Washington, D. C., was on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

The plaintiff corporation sues to recover $196,686.47, with interest, as Federal income taxes overpaid for the calendar years 1942, 1943, and 1944. The issue presented is whether the Commissioner of Internal Revenue properly disallowed a deduction of $464,861.93 for 1944, which was claimed by plaintiff to be a wholly or partially worthless bad debt, or a loss in that year. If the deduction is allowed, plaintiff is entitled to a refund for 1944, and for the two preceding years because of the resulting net operating loss carryback.

The plaintiff was engaged in the wholesale coal business, buying, selling, and transiting coal. It functioned principally as a sales agent for small coal producers and its income was derived from commissions on sales of coal. It arranged for the sale of the coal to a wholesaler, or other customer, collected the sales price, and remitted to the coal producer the sale price, less its commission, subject to accounting balances. In order to keep its customers, plaintiff had to have a ready supply of coal to satisfy their requirements.

It was the custom of plaintiff, in the ordinary course of its business, to advance money to coal operators against future coal deliveries to enable the mine operators to meet current mining costs and payrolls and produce the coal required for plaintiff's customers. Plaintiff borrowed and repaid many millions

of dollars in conducting its business as factor and sales agent.

In 1936 George W. Anderson acquired at a public auction for $50,000 the plant, equipment, and lease known as the Margarette lease, from a defunct coal company. The purpose of acquiring the Margarette lease was to control the supply of coal for plaintiff's customers. These assets were transferred to the Margarette Coal Corporation which was formed in 1936.

The stock of plaintiff and the Margarette Coal Corporation was owned directly or indirectly by George W. Anderson and George P. Oswald. They were the directors and officers of both corporations, and the books and records of both companies were kept at the principal office of the plaintiff.

The Margarette Corporation immediately began mining operations in the underground workings of the Margarette lease and continued to mine coal on a profitable basis from 1936 to 1942, when the underground workings on that lease from a profitable and practical standpoint were exhausted. On January 1, 1942, the plaintiff was indebted to the Margarette Coal Corporation in the sum of $29,166.19 for coal shipped and sold from the Margarette lease.

On January 1, 1942, Margarette Coal Corporation obtained a lease known as the Frances lease. The Frances lease was not as good as the Margarette lease because the coal thinned out and existed in fewer and more isolated blocks. No consideration was paid for the Frances lease other than the royalties agreed to be paid on coal produced therefrom. Margarette Coal Corporation moved its tram road facilities and movable equipment from the Margarette lease over to the Frances lease and used the tipple on the Margarette lease to handle the Frances lease production. The operation on the Frances lease was primarily deep mining, with some limited amount of strip mining.

After the regular deep-mining operations on the Margarette lease had been completed in 1942, a study and examination of this property was made by Mr. Gerdetz and he advised Margarette Coal Corporation that it could recover substantial quantities of coal by strip mining the crop lines at the surface and the fringes of the underground workings, and presented a plan for such operations. Strip mining on this lease was started in 1942 and continued into 1944.

The officers of plaintiff and Margarette Coal Corporation were acquainted with the general success reported on strip-mining operations, and despite meeting with adverse conditions, continued to expect profitable stripping operations. With some variance in conditions from time to time, the cost of removing the overburden on the Margarette lease greatly exceeded the value of the coal removed and very substantial losses were sustained in the operations. The losses were due to the fact that coal was not found in many places where it was reasonably expected to be; the coal found was often not merchantable because of inferior quality, and the stripping operations were hindered by unexpected water difficulties and by running into underground workings.

In 1944 the Margarette Coal Corporation abandoned its strip-mining operations on the Margarette lease and sold and disposed of all of its stripping equipment and applied the proceeds to the account due plaintiff. Subsequently in 1944, the Richmond Coal Company, which had no connection with plaintiff or its affiliates, entered into a royalty agreement and conducted stripping operations on the Margarette lease. The Richmond Coal Company operations were not successful and it ceased operations in the latter part of 1944.

In 1942, 1943, and 1944, as at other times, plaintiff was the exclusive sales agent for coal produced by Margarette Coal Corporation, and from time to time advanced funds on future deliveries of coal, as was done in the case of other coal producers. The same commission was charged by plaintiff on sales of Margarette production as on coal from other

operators, and the sales were handled in the customary manner.

The advances of cash to and credits for coal sold for Margarette Coal Corporation were carried on plaintiff's books and records as an open account. This account for the years 1942, 1943, and 1944 is summarized below.[1] There were no notes or other written instruments of indebtedness and no mortgages or other form of security. Interest was not charged. Plaintiff and Margarette Coal Corporation treated their relationship as that of debtor and creditor on open account.

On December 31, 1944, the open account indebtedness of Margarette Coal Corporation to plaintiff was $601,339.18. During the years 1942 through 1944 the supply of coal was short and the advances made by plaintiff to Margarette Coal Corporation and other producers were to enable the production of a needed supply. The advances to Margarette Coal Corporation went into its overall operation on both the Margarette and the Frances leases. The net advances that plaintiff made to Margarette Coal Corporation exceeded by far the advances made to coal producers who had no stock affiliation with it. The two largest losses suffered by plaintiff in making advances to coal mining companies, other than the Margarette Coal Corporation, had occurred prior to 1936, when losses were sustained amounting to $100,000 on one account, and $150,000 on another.

The officers of plaintiff and Margarette Coal Corporation reasonably and in good faith expected that the stripping operations on the Margarette lease would result in production of a substantial tonnage of coal, which, together with production on the Frances lease, would result in sufficient coal deliveries to repay plaintiff's advances. The inability of Margarette Coal Corporation to produce sufficient coal to offset plaintiff's advances resulted almost entirely from the failure of the strip-mining operations on the Margarette lease.

In November or December 1944, plaintiff's chief accounting officer made a detailed investigation of the Margarette Coal Corporation's account and prepared a schedule showing the book value of Margarette's assets and liabilities, adjustments made by him from his investigation, and the actual values as determined from his investigation. Based on this investigation and schedule adjusted to December 31, 1944, he determined that the excess of adjusted values of Margarette's assets over liabilities was $136,-477.25, exclusive of the $601,339.18 indebtedness to plaintiff. At that time the Margarette lease was practically exhausted and the deep-mining operations on the Frances lease were costly, and it reasonably appeared that no substantial profits would be made on the Frances operations. The plaintiff determined that the maximum part of the Margarette Coal Corporation indebtedness of $601,339.18 that

1. 1942:

| | | |
|---|---:|---:|
| Advances made | $437,973.19 | |
| Credits | 352,563.97 | |
| Excess of advances over credits | | $85,409.22 |
| 1943: | | |
| Advances made | 754,943.29 | |
| Credits | 427,050.59 | |
| Excess of advances over credits | | 327,892.70 |
| 1944: | | |
| Advances made | 421,872.66 | |
| Credits | 233,835.40 | |
| Excess of advances over credits | | 188,037.26 |
| Total excess advances over credits | | 601,339.18 |

could be recovered was $136,477.25, and it wrote down the account in the amount of $464,861.93 as being worthless to that extent. The plaintiff continued to advance Margarette Coal Corporation money in connection with the operation of the Frances lease. Subsequent events show that the Frances lease operation was slightly better than a break-even operation and that the $464,861.93 write-down was not recovered. Throughout its operations Margarette Coal Corporation never paid dividends to its stockholders.

The plaintiff claimed a deduction of $464,861.93 for worthlessness of the Margarette open account indebtedness on its tax return for 1944, and attached the balance sheet and schedule prepared by its accountant.

Upon audit of plaintiff's 1944 return, the Commissioner disallowed the bad-debt deduction on the ground that an actual debtor-creditor relationship did not exist, and, if it did, it was not established that the debt became worthless within the year 1944. Additional assessment for 1944 was made by the Commissioner and paid by plaintiff. Timely claims for refunds were filed, rejected, and this suit followed.

The plaintiff contends that the evidence shows a *bona fide* debtor-creditor relationship between itself and the Margarette Coal Corporation and that the $464,861.93 was deductible in 1944 either as a bad debt, wholly or partially worthless in that year, or as a loss sustained in that year. The defendant contends that a true debtor-creditor relationship did not exist, and, if it did, the plaintiff has not shown that the Commissioner of Internal Revenue was arbitrary in refusing to allow the $464,861.93 as a partial-bad-debt deduction in 1944.

The pertinent part of section 23 of the Internal Revenue Code of 1939, as amended, 26 U.S.C. § 23 provides:

"In computing net income there shall be allowed as deductions:

\*    \*    \*    \*    \*

"(k) *Bad debts.* (1) *General rule.* Debts which become worthless with-

in the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. \*    \*    \*"

The record amply supports the finding of the commissioner of this court that the plaintiff's advances to Margarette Coal Corporation were made with a reasonable expectation of repayment and represented a true indebtedness. The defendant, in its argument on the lack of genuineness of the debt, relies on the fact that two individuals owned, directly or indirectly, both the debtor and the creditor corporations, and the fact that plaintiff's net advances to Margarette Coal Corporation were far greater than those made to nonaffiliated companies.

The common ownership factor requires a close scrutiny of the transaction to see that it was one of substance and one that could have reasonably been made between parties dealing at arm's length. The record shows that plaintiff dealt with Margarette Coal Corporation in exactly the same manner that it did with other coal producers, except for the greater net advances made to Margarette. The plaintiff has shown that the advances were made because of the need for coal and the reasonable belief that sufficient coal could be mined from the Margarette and Frances leases to warrant the expense of mining it. There is no evidence indicating that a person dealing at arm's length with Margarette Coal Corporation would have done anything different under the same conditions. Under the facts of this case there is no room for argument of tax avoidance because of the common ownership of two corporations.

The plaintiff's contention that the $464,861.93 is deductible under the totally worthless bad-debt provision is without merit. The debt was $601,339.18, and only part of that debt was worthless.

■ We turn now to the question of whether the Commissioner properly denied a deduction of the $464,861.93 as a partially worthless bad debt in 1944. It is seen from section 23(k) (1), supra, that the Commissioner has a certain amount of discretion in determining whether a debt is partially worthless and the extent thereof within a particular taxable year. His determination is not to be lightly set aside. However, he cannot arbitrarily refuse a deduction when the facts clearly show that the debt is partially worthless and the extent thereof.

■ The determination of whether a debt is partially worthless within a taxable year is usually a pure question of fact and depends on the circumstances surrounding the debtor and his ability to pay the obligation. The facts of the instant case show that the Commissioner abused his discretion in refusing to allow the deduction of the $464,861.93 as a partially worthless bad debt in 1944.

The commissioner of this court has found that the facts facing the plaintiff in 1944 were these. A realistic appraisal of its debtor's assets over liabilities, exclusive of its obligations to the plaintiff, was $136,477.25. The only other potential source of repaying any of the $601,339.18 were two leases. One was the Margarette lease, which could no longer be mined at a profit. An independent coal producer attempted to mine coal under the Margarette lease and was unsuccessful and abandoned the operation in 1944. The other lease was the Frances lease, which was not wanted by anyone because it was known that the remaining coal under that lease was thinned out and existed only in isolated spots and that the cost of mining the coal would be extremely high. The fact that the lease laid idle for 7 years during a period in which there was a shortage of coal, and was obtained for nothing other than payment of royalties, indicates that it was not a very desirable lease. It was reasonable to expect that no more than the $136,477.25 could be recovered on the operations under the Frances lease.

If the plaintiff was going to allow its debtor to go out of business, most of the additional $136,477.25 would be lost because most of the equipment on the leases would revert to the lessor. Further, there was a great need for coal, and if plaintiff could have it mined, even if only on a break-even basis, it could retain its customers and make a profit on the sale and still recoup some of its $136,477.25. There is absolutely no evidence in the record to indicate that the debtor had any reasonable possibility of repaying the full advances. The fact that money was advanced from week to week to mine coal after 1944 on this lease does not in the slightest way affect the question of whether or not in 1944 there existed any reasonable expectation of repayment of the entire $601,339.18. The facts of this case clearly show that the $601,339.18 debt was partially worthless in 1944. The evidence on the extent of worthlessness sustains the $464,861.93 claimed by plaintiff.

The subsequent history of the operation of the Margarette Coal Corporation bears out the conclusion that none of the $464,861.93 was recoverable after 1944. The plaintiff is entitled to deduct under section 23(k) (1) the $464,861.93 as a partially worthless bad debt in 1944.

The defendant argues that the question of whether the Commissioner of Internal Revenue abused his discretion should be decided on the "record" made before him rather than on the record made before this court. The tax laws contemplate a trial de novo, and there is nothing in the partial-bad-debt provision that indicates the contrary. The taxpayer claiming a partially worthless bad debt should prove or attempt to prove that the debt was partially worthless, not come into court and show what he furnished the Commissioner of Internal Revenue to convince him that the debt was partially worthless. As a practical matter, the Commissioner of Internal Revenue generally has before him the same information that is before the court in partial-bad-debt cases since it behooves the taxpayer to convince the Commission-

er. Contrary to defendant's statement, there was far more than just a balance sheet before the Commissioner of Internal Revenue when he made his decision in this case. The Commissioner conducted a complete field audit of the plaintiff and its related corporations' books and tax returns, had many conferences with the same individuals who testified in this case, and had the complete cooperation of plaintiff.

The plaintiff is entitled to recover, and judgment will be entered in the amount of $54,148.65 for 1942, with interest from June 12, 1945; $55,854.50 for 1943, with interest from June 12, 1945; and $86,683.32 for 1944, with interest from March 11, 1953, as provided by law.

It is so ordered.

JONES, Chief Judge, and LITTLETON, Judge, concur.

WHITAKER, Judge (dissenting).

During the year 1944 George P. Oswald and G. W. Anderson were jointly interested in two enterprises, one, the mining of coal, and, the other, the selling of coal which they mined and which was mined by others. They incorporated each enterprise. The mining enterprise was incorporated in the year 1936 under the name of the Margarette Coal Corporation. The selling enterprise was incorporated under the name of George E. Warren Corporation. Oswald and Anderson each owned 50 percent of the stock of the two companies, either directly or indirectly.

The selling end of their business, operated as the George E. Warren Corporation, advanced money to the mining end, operated as the Margarette Coal Corporation, to enable it to produce coal for sale. These advances were repaid as far as possible from the coal mined and sold; but during the years 1942 to 1944 the mining company had fallen far behind, and by the end of 1944 was indebted to the selling company in the sum of $601,339.18.

At the end of 1944 the selling company sought to charge off as a bad debt $464,-861.93 of the debt of $601,339.18 owed it by the mining company. The issue presented is their right to deduct this sum from their gross income for 1944 as a partially worthless debt, or as a loss.

At the end of 1944 the Margarette Coal Corporation, the mining end of the business, owned two coal leases, one called the Margarette lease, and the other the Frances lease, and it also owned another piece of coal mining property adjacent to the Frances lease, which was added to the Frances lease in May 1944. From 1936, when the Margarette Coal Corporation was organized, until 1942 all mining operations were carried out on the Margarette lease, but on January 1, 1942, the Frances lease was acquired, and in 1944 the adjacent property was added to it, and thereafter operations were carried out on both leases. In 1942 deep mining was discontinued on the Margarette lease, and strip mining was begun. The strip mining operations, however, did not prove profitable, and they were discontinued, except through sublessees, in 1944.

Plaintiff, the selling enterprise, claims that in 1944, when it itself ceased to mine the Margarette lease, it determined that it would never be able to collect $464,-861.93 of its claim against the mining company of $601,339.18, and that it is entitled to charge that amount off as a bad debt. The fundamental basis for this determination is an alleged belief that coal could not be mined profitably from the Frances lease and from subleasing the Margarette lease, or at least profitably enough for them to recover the entire $601,339.18; but they did think they could recover as much as $136,478.-25.

It is difficult to see how plaintiff was able to predict with any assurance that the operations of the mine for the next 8 or 9 years would net $136,478.25, but not $601,339.18. It certainly thought the mining enterprise could still operate at a profit, for it intended in 1944 to advance it further money, and in the next 7 years plaintiff, in fact, advanced it from $400,-000 to $1,400,000 a year, which was paid

back, in part, from coal mined and sold. Certainly these large advances would not have been made unless they thought the mine could be operated at a profit; but how could they tell that these advances would finally net them $136,478.25, and not $601,339.18?

I think plaintiff could do no better than guess at what the future held in store. It is, of course, true that an important attribute of a successful business man is the ability to foretell the future, but bear in mind that it was plaintiff's chief accountant who made this guess, not a man familiar with coal mining, or one in charge of operations. This chief accountant wrote down the book value of the assets of the mining venture, and as a result determined that the assets were worth $136,478.25 more than the liabilities, not counting this debt to plaintiff. Deducting this excess from the amount of the debt, he determined that the balance was a bad debt. This was the exact amount plaintiff claimed as a bad debt.

This might have been all right if it had been the intention to liquidate the mining venture; but this was not the intention; they intended to continue to operate it. The relation between assets and liabilities did not reflect potential earnings, or greatly affect them, since plaintiff intended to put up the operating capital. Where the debtor is continuing in business, the worthlessness of a debt is to be determined not only by the debtor's financial condition at the time the debt is charged off, but by its future prospects. No one familiar with the operation of the mine was willing to make any definite prediction on the amount of the profit it might expect to realize in the near future. The nearest any one came to it was Mr. Anderson, a co-owner with Oswald. He said, "We couldn't look forward to any substantial profit out of this property under normal competitive conditions." What he meant by "substantial" he did not explain.

One cannot but doubt that they expected to realize no more than $136,000 on their old debt, since in the following year they advanced the mining company $419,000, of which they got back only $312,000, and in the following year $538,000, of which they got back $486,000, and in the following year $1,391,000, all of which they got back and $51,000 more. The next year they advanced $1,375,000 and got back $224,000 more than they advanced. And so on. This was a lot of money to advance, with little hope of substantial profits. How could the taxpayer look 7 or 8 years ahead and tell how much those profits would be? Before a debt can be charged off as worthless, it must not only be uncollectible at the time, but in the foreseeable future. Treas. Reg. 111, sec. 29.23(k)–1, as amended by T.D. 5376, 1944 C.B. 119.

But, even if the taxpayer was satisfied it would be unable to collect no more than $136,000 on the debt, it still is not entitled to deduct the part it believed it could not collect unless it could "satisfy" the Commissioner of Internal Revenue that so much of it was uncollectible. The statute reads, Internal Revenue Code of 1939, as amended, 26 U.S.C. 1952 ed.:

"§ 23. *Deductions from Gross Income.*

"In computing net income there shall be allowed as deductions:

\* \* \* \* \*

"(k) *Bad Debts.*

"(1) *General rule.* Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. \* \* \*"

The taxpayer had several conferences with agents of the Commissioner of Internal Revenue, but the record does not disclose what support for the claimed deduction was offered at them. So far as the record before us discloses, the only thing the taxpayer did to satisfy the

Commissioner of Internal Revenue that the debt was worthless was to furnish him with a balance sheet of the mining company as of December 31, 1944, showing reductions in value of the assets made by the accountant, and the resulting net worth, exclusive of plaintiff's debt. There was no supporting statement to justify the adjustments. It is true that, without the adjustments, the mining company did not have sufficient assets to satisfy plaintiff's debt; but this is determinative only in case the mining company was to be liquidated. When a company intends to continue operations, a balance sheet is clearly insufficient to satisfy any one that the company would never be able to pay the debt.

The taxpayer intended to make further cash advances to the mining company, evidently with the expectation that it would be able to operate profitably. It is highly improbable that it would have advanced it further money unless it thought it was going to get back more than it advanced. How much more, no one could tell.

It was entirely reasonable for the Commissioner of Internal Revenue to say that he was not satisfied that the debt was partially worthless.

The Commissioner of Internal Revenue was made the judge of the deductibility of the item claimed. I cannot say that he abused his discretion in disallowing the deduction, and this, the taxpayer must show. Stranahan v. Commissioner, 6 Cir., 42 F.2d 729; Olympia Harbor Lumber Co. v. Commissioner, 9 Cir., 79 F.2d 394; Wilson Bros. & Co. v. Commissioner, 9 Cir., 124 F.2d 606; Lehman v. Commissioner, 2 Cir., 129 F.2d 288. Cf. Art Metal Construction Co. v. United States, 17 F.Supp. 854, 84 Ct.Cl. 312.

The taxpayer is clearly not entitled to the deduction as a loss. The deduction claimed was of a debt worthless in part. The statutory provisions for the deductions of bad debts and of losses are mutually exclusive. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200.

For these reasons I respectfully dissent.

MADDEN, Judge, joins in the foregoing dissent.