*Decision will be entered for the respondent.*

PITTSBURG CANNERS, INCORPORATED, A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 93560.   Promulgated February 27, 1940.

*Walter Slack, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

OPINION.

DISNEY: This proceeding involves deficiencies in income and excess profits taxes for the taxable year beginning July 1, 1934, and ending June 30, 1935, in the amount of $431.94 in income tax and $157.07 in excess profits tax. The return was filed with the collector for the first district of California. The only question presented for our consideration is as to the basis for depreciation and rate of depreciation suffered upon certain assets owned by petitioner. The facts were in part stipulated at the hearing. Such facts are found by us as stipulated. Other evidence was adduced, parol and documentary, facts from which will be hereinafter stated as found, in connection with a summary of the facts presented. The facts stipulated may be epitomized, so far as pertinent, as follows:

The petitioner is a corporation, organized October 20, 1933, under the laws of California, with authorized capital stock of 5,000 shares of a par value of $100 per share. Only 176 shares were issued, to seven people. The business of the corporation was the operation of a fish reduction plant, in a rented building in Pittsburg, California, with

machinery and equipment purchased on credit. September to March is the operating season for that business in the locality where petitioner's business was located. A permit from the state fish and game commission is required by law. Petitioner started operations in the fall of 1933, but its permit to operate was revoked on December 15, 1933, for failure to meet the requirements of the fish and game commission. The creditors were advised, resulting in the appointment of a creditors' committee representing those who had sold machinery and equipment to petitioner, and eventually in a sale to them of petitioner's assets. At the time of appointment of the committee petitioner's debts were approximately $22,000. On December 26, 1933, at a regular stockholders' meeting, the directors were authorized to sell, assign, and transfer to the creditors' committee petitioner's right, title, and interest in the corporation's assets. The terms of sale were that the corporation should assign the assets and the stockholders endorse and deliver the stock certificates to the committee and be relieved of any further liability. The creditors' committee then started negotiations with J. G. Burnette and associates (hereinafter called Burnette), who were engaged in the fishing business, and agreed with Burnette as follows:

The creditors' committee agree to the purchase price of $16,500 for all stock and all assets of Pittsburg Canners and will protect any change in creditors' claims against Pittsburg Canners prior to January 12, 1934, payable as follows: $500 received; $7,000 upon signing contract; balance $1 a ton with minimum $5,000 season beginning August 1934.

[Signed, J. T. Gilmore, Chairman, Creditors' Committee; and Pittsburg Canners, Incorporated, by J. G. Burnette.]

The agreement was carried out, the old directors resigned and new directors and officers were elected at a stockholders' meeting held by the Burnette group on January 31, 1934. Burnette and associates made payments of $7,500, as well as further advances to the corporation, for which they were given credit on the corporation's books, the old books being used for that purpose. The corporation further assumed the liability of Burnette in the amount of $9,000, the balance of the purchase price. The balance due the creditors' committee was paid out of subsequent operations of the corporation, as follows: October 8, 1934, $1,766.95; November 8, 1934, $4,537; December 9, 1934, $2,696.05. The old certificates of stock remained endorsed in blank until they were canceled March 4 and March 5, 1935, and all were reissued to J. G. Burnette except 17.6 shares which were issued to John R. Grigg, neither of whom were former stockholders. On July 1, 1934, a new set of books was opened, showing, among other items, assets, machinery, and equipment at $25,738.80; liability to J. G. Burnette, $4,600; to associates, $4,375; to creditors' committee, $9,000.

In addition to the stipulated facts above, further facts are found by us from evidence adduced, as follows:

Petitioner's journal used in 1933 and 1934 shows under date of January 16, 1934, the following:

J. Gilmore, Chairman Cred. Comm_____ $16,500 –

\*         \*         \*         \*         \*         \*         \*

To set up conditional sale as per agreement dated Jan. 16, 1934,
between Creditors' Committee of Pittsburg Canners, Inc., and
Pittsburg Canners, Inc.

On February 20, 1935, the creditors' committee executed a bill of sale to J. G. Burnette, reciting, so far as here material, as follows: that the directors of petitioner had deemed it expedient and to the best interests of the corporation to sell, assign, and transfer all of the corporation's right, title, and interest in and to the stock and assets of the corporation to a creditors' committee "in full satisfaction of the claims of all creditors of said corporation", and did on December 22, 1933, "vote to sell, assign and transfer all of the corporation's right, title and interest to the Creditors' Committee in full satisfaction of all claims against the corporation", and were authorized to sell by the stockholders on December 26, 1933; that the creditors' committee "accepted the assignment of the corporation's interest, together with all the shares of the stock outstanding, properly endorsed by the shareholders and delivered to the said Creditors' Committee"; that J. G. Burnette about January 12, 1934, agreed to purchase from the creditors' committee on an installment contract all of the committee's right, title, and interest to the assets and shares, and the committee agreed to deliver upon fulfillment of the contract; that the terms of the contract had been fulfilled and completed about November 1, 1934; that therefore the committee, for a valuable consideration, do sell, assign, transfer, and set over unto J. G. Burnette all the assets and shares of stock, discharge Burnette from liability under the installment contract, and declare him to be sole owner of the assets and shares of stock of Pittsburg Canners, Inc.

The books of the corporation show the items of the assets here involved set up at a cost of $25,738.80, together with rate and amount of depreciation set up for 1933–1934, additions 1934–1935 amounting to $3,967.58, and depreciation set up for 1934–1935 amounting to $4,079.59.

The Commissioner determined that the basis for depreciation was $16,500 paid Burnette, plus costs of sale, and attorneys' fees, making a total of $17,087.50 as of June 30, 1934, and, with $3,967.58 additions during 1934–1935, a total of $21,055.08 on June 30, 1935. Petitioner in figuring its return as of June 30, 1935, computed depreciation on the original cost of $25,738.80 as shown by its accounts, and deducted depreciation of $4,079.59 based on a cost of $29,706.38—including additions in 1934–1935 of $3,967.58.

The question presented is, whether petitioner shall be allowed as base for depreciation its original cost, as adjusted, or whether it transferred the property, reacquired it, and must take the basis of cost upon reacquisition. The determinative question, however, is whether petitioner ever transferred the assets, for obviously if it did, the cost upon reacquisition must be its base.

Petitioner's position is summarized in its opening brief: "While in some externals the transaction has the characteristics of a sale, fundamentally it was a pledge or hypothecation of its assets to its creditors and a redemption of them." Also: "True there was a bill of sale from the committee to Burnette and Burnette to petitioner, but these only served to keep the title clear and reliance upon them alone ignores vital elements more properly characterizing the transaction." Petitioner cites *Commissioner* v. *Lazarus & Co.*, 101 Fed. (2d) 728 (since affirmed 308 U. S. 252), where depreciation was allowed to one who had transferred legal title, but only as security, and says that the facts here "places the apparent absolute sale to the Creditors' Committee in the same classification as the deed in the Lazarus case." Petitioner also cites *James D. Boone*, 27 B. T. A. 1064, and cases there cited, as to the right to vary by evidence the terms of a written instrument.

We agree that petitioner has a right to explain such an instrument as here involved, the proceeding not being between the parties; also that the *Lazarus* case is authority that one conveying legal title, but only by way of security, should be allowed depreciation on the property conveyed. But the question here is, whether petitioner has shown a conveyance only by way of security. That there was a sale to the creditors' committee is not denied, the contention being that it was not absolute, but as security. The burden is upon petitioner to prove that the "apparent absolute sale" was only a mortgage or security transaction. We think that such showing has not been made, but that on the contrary the evidence shows that the conveyance was not by way of security. Petitioner, as argument for its position, points out that the creditors did not wish the property, but only wished their money. But it is not what the creditors wished to do, but what they did, that is of effect. Moreover, though the creditors did not wish the assets, the stockholders quite positively wished to get rid of them, and to release the corporation from liability for the purchase price. The evidence is that the directors deemed it expedient and to the best interests of the corporation to sell the assets, and corporate stock, "in full satisfaction of the claims of all creditors of said corporation." The same expression is quoted in referring to the vote taken by the directors on December 22, 1933. Moreover, it is stipulated that "The terms of the sale were that the corporation should assign the assets

and the stockholders endorse the stock certificates and deliver them to the creditors' committee and be relieved of any further liability." There was no further stockholders' liability, as the creditors realized, so the only release from liability which could be of interest was that of the corporation itself. It thus appears that the consideration for the transfer to the creditors was the release of the corporate liability. But the release of liability is wholly inconsistent, we think, with any idea that the conveyance was merely to *secure* the liability and the debt to the creditors. *The debt was obliterated in consideration of the transfer.* No element of mere security or hypothecation could remain. The corporation had nothing further to pay, and the desire, in fact the insistence, of the stockholders that the creditors take the property is out of keeping with a desire to retain equitable title and a chance to discharge the debt. The creditors tried unsuccessfully to get the stockholders to do that very thing: "we endeavored to have them agree to some plan of—an extension of their accounts, an extension of the unpaid portion, thinking that possibly within a period of three years they might be able to set aside sufficient money to retire the obligations." But "They [the stockholders] decided to turn the entire plant over to the creditors and let us dispose of it as best we could."

We find it impossible to think that corporation officers in such a frame of mind, desiring and securing a release of liability in consideration of a transfer of property, were retaining title. On such questions usually, and in fact necessarily, there is evidence that the intent was, contrary to the terms of the formal conveyance, to retain title and power to redeem. No such evidence here appears; the contrary appears. What later happened is of no consequence if the title, legal and equitable, left the corporation in the first conveyance to the creditors' committee. Yet what later appears bears out, rather than contradicts, our conclusion that the conveyance to the committee was absolute, for the committee conveyed absolute title to Burnette with nothing in the bill of sale to indicate any right left in the petitioner corporation. This the committee would have had no right to do, had there been a right left in the corporation. The bill of sale recited that Burnette was the sole owner. Again, though petitioner argues that the petitioner merely redeemed and that Burnette did not purchase from the creditors' committee, because the $7,500 paid by Burnette and associates was set up on petitioner's books, and $9,000 paid out of petitioner's operations, yet it is stipulated that "The corporation further assumed the liability of Burnette in the amount of $9,000, the balance of the purchase price." But since there was a liability on the part of Burnette (who had not previously had any connection with petitioner), it is plain that he did purchase; further, that

petitioner could not assume a liability which, on its present theory, was already its own. Obviously, we think, all liability of petitioner was forgiven by the creditors in consideration of absolute, and plainly voluntary, conveyance by the corporation, the creditors' committee conveyed to Burnette, and petitioner, by arrangement with him, took an equitable if not a legal title. We therefore conclude and hold that petitioner is not entitled to the original base for depreciation, and has not shown error by the respondent in that regard.

We hold, however, that the rate of depreciation should be 13⅓ percent based upon a useful life of 7½ years for the assets. The evidence was positive that this was the fair composite rate, and the fact that some items might have a longer, and some a shorter, life is immaterial. The respondent himself had used a composite rate.

*Decision will be entered under Rule 50.*