Ellis Carp and C. Fay Carp, et al. [1] v. Commissioner. Carp v. Commissioner
Docket Nos. 70129, 76364-76366.
United States Tax Court
T.C. Memo 1961-340; 1961 Tax Ct. Memo LEXIS 11; 20 T.C.M. (CCH) 1772; T.C.M. (RIA) 61340; November 22, 1961
Ronald M. Mankoff, Esq., and Wentworth T. Durant, Esq., for the petitioners. Graham R. E. Koch, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the income tax of petitioners and additions to tax for the years and in the amounts as follows: Additions to tax, I.R.C. 1939
Sec.
Sec.
Docket No.
Year
Deficiency
294(d)(1)(A)
294(d)(2)
70129
1952
$78,405.77
1953
71,464.78
76364
1954
3,631.40
$483.55
$322.36
76365
1954
40,867.44
76366
1954
2,736.68
*12 All dockets were consolidated for trial and decision. The issues presented for our decision are (1) whether annual additions to petitioners' bad debt reserves for 1952, 1953, and 1954 were excessive and unreasonable; (2) whether petitioner Ellis Carp is entitled to a deduction for compensation for 1953 in the amount of $694,357.11; and (3) whether petitioner Carp is entitled to a deduction claimed for supervisory expenses for 1953 in the amount of $766.73. Another issue raised by the pleadings has been disposed of by concession of the parties. General Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Ellis Carp and C. Faye Carp are husband and wife residing in Dallas, Texas. They filed joint income tax returns for 1952, 1953 and 1954 with the director at Dallas. Petitioners Stanley C. and Elsie Pearle are husband and wife residing in Dallas, Texas. They filed a joint income tax return for 1954 with the director at Dallas. Petitioners Robert K. and Irma A. Shannon are husband and wife residing at Dallas, Texas. They filed a joint income tax return for 1954 with the director at Dallas. During the years here involved petitioner *13 Ellis Carp was an optometrist engaged in the examination of patients for the fitting of eyeglasses and the sale of optical supplies and merchandise in offices located throughout the State of Texas and elsewhere. Carp owned and operated approximately 75 optical stores during 1952, 1953, and 1954, the majority of which he owned and operated as sole proprietor. Four of these stores, which were located in San Antonio and Corpus Christi, Texas, were operated in partnership with petitioner Stanley C. Pearle. Four other such stores, located in Austin and San Antonio, Texas, were operated in partnership with petitioner Robert K. Shannon. All of the stores operated by Carp during the years in question, whether owned solely by him or in partnership with Pearle and Shannon, were conducted under the name of Lee Optical Company. Petitioner filed partnership returns for the years here in issue with the director in Dallas. Issue 1. Bad Debt Reserve Findings of Fact During the years here involved Carp, sometimes hereinafter referred to as petitioner or Lee Optical Company, operated a number of optical stores on leased premises under the name of Lee Optical Company and also leased office space *14 for such outlets (doing business as Lee Optical Company) as departments in two retail jewelry chains, Gordon's Jewelry Co. of San Antonio, Inc., and Zale Jewelry Company, Inc. Both Gordon's and Zale had a number of stores located throughout the State of Texas and in other states in the southwestern United States. Zale and Gordon's were highly competitive and both had outlets in a number of the same cities in Texas. Of the approximately 75 stores operated by petitioner during 1952, 1953, and 1954, 28 were separately located Lee Optical Stores. Thirty-two stores were located in Zale and 14 in Gordon's. [2]
In 1945 petitioner contracted with Zale Jewelry Company, Inc., for the lease of office space. The pertinent provisions of the lease agreement may be summarized as follows: (1) Zale agreed to lease to Lee, store space in all of its stores in the State of Texas, for use as optical departments to be operated by Lee. (2) Zale was to receive a monthly rental in an amount equal to 20 percent of petitioner's gross sales. (3) Worthless accounts were to be deductible *15 from the preceding year's gross sales. The worthlessness of delinquent accounts was to be determined by the joint agreement of the parties. (4) Zale was not to sell merchandise similar to petitioner's. (5) Zale agreed "at its expense and without charge to Second Party [petitioner] * * * to service the accounts of Second Party." During 1952 petitioner Carp contracted with Gordon's Jewelry Co. for the lease of office space under an agreement which provided in substance as follows: (1) Petitioner was restricted to optometrical sales and services and was prohibited from selling merchandise handled by Gordon's. (2) The contract was expressly stated to be a lease, not a partnership or a joint venture between petitioner and Gordon's. The percentage payments were designated as "rental payments." (3) Gordon's was to furnish bookkeeping and credit facilities. (4) All money received from petitioner's customers or patients was to be paid to Gordon's cashier who was to keep an accurate record thereof open to the inspection of both parties. (5) As rental, and in payment for the services to be furnished by Gordon's, petitioner was to pay 20 percent of all actual and final sales, *16 cash or charge, of merchandise sold or services rendered on the premises. (6) Gordon's was to advance monthly to petitioner an amount equal to petitioner's actual final sales during the preceding month, less the percentage due as rental. (7) The lease provides that after such advances by Gordon's - all accounts receivable resulting from credit and/or installment sales shall be and become the exclusive property of Lessor, as well as all security for the same. In connection with the foregoing, it is understood and agreed, however, that all balances on all credit and/or installment sales, when determined by Lessor to be uncollectible, (and Lessor's determination as to if and when the same may be uncollectible shall be final and conclusive) shall be charged back against Lessee and deducted from amounts thereafter to be remitted to Lessee by Lessor, or paid by Lessee to Lessor, as the case may be, it being the intention of the foregoing to provide that uncollected balances when determined by Lessor to be uncollectible shall be charged back to and become the responsibility of Lessee. * * * (8) Credit sales and terms were to be approved by Gordon's. (9) On termination of the lease, *17 "to protect itself against items on credit sales which may become uncollectible," Gordon's was to retain a reserve against chargebacks equal to 50 percent of the aggregate uncollected accounts. Gordon's maintained a separate account card for each customer who made a credit purchase. Each account card contained the customer's name and credit information relating to jewelry purchases and if sales were made through Lee Optical stores located on its premises the card also disclosed information on his optical purchases from petitioner. As a matter of practice, Lee's employees actually determined whether or not credit would be extended to a customer in a store operated on the premises of Gordon's. It was the consistent practice of Lee Optical Company to confer with representatives of Gordon's and Zale in determining the collectibility or worthlessness of delinquent accounts resulting from sales made on the premises. Petitioner's lessors, Zale Jewelry Company, and Gordon's Jewelry Company, were not required under the lease agreements to furnish petitioner with the amount of his accounts receivable carried on their books. The annual outstanding accounts receivable attributable to sales *18 of Lee Optical Company made through stores located in Zale and Gordon's were commingled with the other outstanding accounts of those stores and therefore were not known by petitioner and were not made available to him. Prior to 1950 the sales of Lee Optical Company were primarily cash sales but during 1950 its credit sales increased sharply. The retail price of petitioner's merchandise ranged from $8.50 to $20 per item. The customers of Lee Optical Company were primarily individuals of low income to whom credit was extended on lenient terms. During 1950 petitioner requested permission to change to the reserve method of charging off bad debts. His request was granted by the respondent. During years prior to 1950 the loss experience of petitioner on bad debts amounted to approximately 10 percent of his charge sales for the year prior to the year in which the accounts were charged off as worthless. For each of the years 1951 through 1955, inclusive, petitioner's loss experience on bad debts averaged 10.7 percent of his charge sales for the years prior to the year in which the debts were charged off as worthless. The outstanding accounts of Lee Optical Company were reviewed *19 at the end of each year by petitioner to determine whether or not they should be written off as losses. The average outstanding account amounted to $14 or $15. Petitioner's practice during the years here involved was to follow up delinquent customers with telephone contacts and also to send them a series of six collection letters in an effort to stimulate activity on slow or worthless accounts. Because of the small amount of the average outstanding account ( $14 to $15) and the proportionately high cost of litigation, petitioner did not follow the practice of bringing suit to collect bad accounts. [3]
Lee Optical set up a reserve for bad debts by crediting thereto an amount equal to 10 percent of the annual net charge sales of the business. Petitioner continued throughout the years in issue to follow the practice of adding to his bad debt reserve at the end of each year an amount equal to 10 percent of the net charge sales for that year. During 1952, 1953, and 1954 the greater portion of the business of Lee Optical *20 was in credit sales. The policy of Zale Jewelry Company during the years here involved was to write off as worthless those accounts on which (1) no payment had been made for at least 90 days, and (2) no additional sales had been made during the immediately preceding 90-day period. Zale annually determined the worthlessness of its outstanding accounts on March 31, the end of its fiscal year. The policy of Gordon's Jewelry during the years involved was to write off as worthless only its outstanding accounts upon which there had been no activity for at least 9 months. Gordon's made a quarterly determination of the worthlessness of its outstanding accounts. During March 1954 Lee Optical for the first time in the history of its business employed a credit manager. The results of his intensive efforts and the more efficient collection practices utilized by Lee were reflected in a substantial increase in its recoveries on outstanding accounts during 1955. The gross sales of Lee Optical for each of the years here in question were as follows: Year
Gross sales
1952
$1,447,537
1953
2,429,493
1954
2,943,159
The outstanding accounts receivable carried on the books *21 of the separately located Lee Optical Company stores (other than those located at Gordon's and Zale) as of December 31 of each of the indicated years were as follows: Accounts re-
December 31
ceivable
1952
$ 31,867.05
1953
64,417.80
1954
113,450.46
The accounts receivable carried on Lee Optical Company's books as of December 31 due from Zale and Gordon's were for the current month only and were as follows: December 31
Zale
Gordon's
1952
$45,812.50
$38,064.60
1953
61,807.83
Unknown
1954
55,881.98
Unknown
Petitioner's annual credit sales, his bad debt reserve balances at the beginning and end of each year, the amounts charged annually against the reserve, the recoveries credited to the reserve, reserve additions and certain adjustments to the bad debt reserve for the years 1950 through 1955, inclusive, were as follows: Accounts
Recoveries
Reserve
charged
credited
Reserve
Jan. 1
to reserve
to reserve
additions
1950
Lee Stores
$ 3,330.27
$ 92.50
$ 171.09
Zale Stores
2,124.10
13,261.41
Gordon's
Stores
Total
$ 3,330.27
$ 2,216.60
$ 13,432.50
1951
Lee Stores
($ 3,074.68)
$ 3,740.41
$ 1,000.00
$ 5,244.11
Zale Stores
13,261.41
7,133.75
1,108.95
33,718.82
Gordon's
Stores
Total
$ 10,186.73
$ 10,874.16
$ 2,108.95
$ 38,962.93
1952
Lee Stores
($ 570.98)
$ 18,152.34
$ 938.55
$ 13,006.83
Zale Stores
40,955.43
9,567.91
1,046.33
74,138.80
Gordon's
Stores
269.71
18,729.56
Total
$ 40,384.45
$ 27,989.86 [2]
$ 1,984.88
$105,875.19
1953
Lee Stores
($ 4,777.94)
$ 41,459.59
$ 2,793.10
$ 26,399.07
Zale Stores
106,572.65
43,289.34
846.57
107,604.95
Gordon's
Stores
18,459.85
14,639.66
25.00
51,106.96
Total
$120,254.56
$ 99,388.59
$ 3,664.67
$185,110.98
1954
Lee Stores
($ 17,045.36)
$146,865.39
$25,947.10
$ 72,251.50
Zale Stores
171,734.83
57,323.96
2,276.21
84,537.70
Gordon's
Stores
54,952.15
44,536.52
385.10
61,363.32
Total
$209,641.62
$248,725.87
$28,608.41
$218,152.52
*22 Adjustments
income
Reserve
Credit
(decrease)
Dec. 31
sales
1950
Lee Stores
($ 8.00) [1]
($ 3,074.68)
$ 22,256.73
Zale Stores
(2,124.10) [1]
13,261.41
112,068.27
Gordon's
Stores
Total
($2,132.10)
$ 10,186.73
$ 134,325.00
1951
Lee Stores
($ 570.98)
$ 52,441.05
Zale Stores
40,955.43
335,497.30
Gordon's
Stores
Total
$ 40,384.45
$ 387,938.35
1952
Lee Stores
($ 4,777.94)
$ 130,068.30
Zale Stores
106,572.65
741,388.00
Gordon's
Stores
18,459.85
187,295.60
Total
$120,254.56
$1,058,751.90
1953
Lee Stores
($ 17,045.36)
$ 263,990.68
Zale Stores
171,734.83
1,024,798.81
Gordon's
Stores
54,952.15
512,668.27
Total
$209,641.62
$1,801,458.86
1954
Lee Stores
$4,086.83 [3]
($ 61,625.32)
$ 719,372.87
Zale Stores
201,224.78
843,918.91
Gordon's
Stores
72,164.05
613,003.32
Total
$4,086.83
$211,763.51
$2,176,295.00
Worthless *23 accounts charged off by Lee Optical Company in 1955 totaled $207,121.23. On their income tax returns for 1952, 1953, and 1954, petitioners Ellis and Faye Carp claimed deductions in the amounts of $105,875.19, $185,110.98, and $218,372.52, respectively, representing annual additions to their reserve for bad debts. The respondent disallowed in full the deduction claimed by petitioners for 1952 in the amount of $105,875.19. In his notice of deficiency the respondent stated that without the 1952 addition claimed by petitioners they would have an adequate opening reserve for 1953 of $16,511.47. The deduction claimed for 1953 in the amount of $185,110.98 for a reserve addition was disallowed by the respondent to the extent of $103,015.21, and the difference of $82,095.77 was allowed as a reasonable addition to petitioners' bad debt reserve for 1953. Respondent's computation allowed petitioners an opening reserve for 1954 of $2,883.32. He disallowed to the extent of $63,707.38 the amount of $218,372.52 claimed by petitioners for 1954 as an addition to their reserve for that year and allowed the difference of $154,665.14 as a reasonable addition. On the partnership return filed by petitioners *24 Carp and Pearle for the Corpus Christi partnership stores Nos. 16 and 18 for the fiscal year ended July 31, 1954, they claimed a deduction for an addition to the bad debt reserve in the amount of $29,668.04. The respondent disallowed $14,576.73 of this amount, allowing a deduction for a reserve addition to the extent of $15,091.31. On the partnership return filed by petitioners Carp and Pearle for their San Antonio partnership stores Nos. 20 and 26 for the fiscal year ended July 31, 1954, they claimed a deduction for an addition to their bad debt reserve in the amount of $16,604.65. The respondent disallowed $8,621.11 of this amount, and allowed a deduction of $7,983.54. On the partnership return filed by petitioners Shannon and Carp for their San Antonio partnership for the fiscal year ended January 31, 1954, they claimed a deduction for an addition to their bad debt reserve in the amount of $2,379.52, which was disallowed in full by the respondent. On the partnership return filed by petitioners Shannon and Carp for their Austin partnership for the fiscal year ended January 31, 1954, they claimed a deduction for an addition to their bad debt reserve in the amount of $8,600.15, *25 which was disallowed in full by the respondent. Ultimate Finding The outstanding accounts resulting from sales made on the premises of Gordon's and Zale belonged to petitioner and not to his lessors. The annual additions to petitioner's bad debt reserve which were charged off during 1952, 1953, and 1954, both in the stores owned solely by Carp and in those stores owned by him in partnership with petitioners Shannon and Pearle, were reasonable with respect to the actual bad debt losses experienced during those years. Opinion Section 166(c) of the Internal Revenue Code of 1954[4] and section 23(k)(1) of the Internal Revenue Code of 1939[5] permit a taxpayer, in the discretion of the Commissioner, to deduct annually a "reasonable addition to a reserve for bad debts." *26 Petitioner in 1950 requested the Commissioner's permission to change from its method of charging off specific bad debts for the year in which they became worthless to the reserve method of charging off bad debts. The Commissioner granted petitioner permission to change to the reserve method. The respondent does not question that petitioner is entitled to utilize a reserve for bad debts during the years in issue and to deduct reasonable additions thereto. His position is that the amounts added by petitioner to his bad debt reserve for 1952, 1953, and 1954 are excessive and unreasonable. Petitioner contends that his additions to the reserve for the years in question are entirely reasonable and therefore are properly deductible. It is incumbent upon petitioner to show not only that the amount of his annual reserve additions are "reasonable"but also that the respondent was acting arbitrarily and in abuse of the discretion vested in him by Congress in disallowing a portion of those additions. C. P. Ford & Co., Inc., 28 B.T.A. 156; Platt Trailer Co., 23 T.C. 1065; *27 Krim-Ko Corporation, 16 T.C. 31; Maverick-Clarke Litho Co., 11 T.C. 1087, affd. 180 F. 2d 587; First National Bank of LaFeria, 24 T.C. 429, affd. per curiam 234 F. 2d 868. Petitioner's business during the years here involved was the operation of a chain of optical stores. His customers were primarily individuals with low income to whom credit was extended on lenient terms. During the 3 years here involved, the average of total sales of Lee Optical Company was $2,273,396.33, and the average credit sales amounted to $1,678,835.25. The retail price of the merchandise sold by the Lee stores ranged from $8.50 to $20 per item. The average account outstanding on petitioner's books during 1952, 1953, and 1954 amounted to $14 or $15. The collection method followed by Lee Optical during these years consisted of telephone contacts with delinquent purchasers and the mailing of a series of collection letters. Because the delinquent accounts involved small amounts, Lee Optical did not bring suit to recover them. Petitioner's method *28 of computing the annual additions to his bad debt reserve on the basis of a percentage of annual sales repeatedly has been upheld in cases involving the question of the reasonableness of a taxpayer's annual addition. Proctor Shop, Inc., 30 B.T.A. 721, affd. 82 F. 2d 792; Transatlantic Clock & Watch Co., 3 B.T.A. 1064; Shield Co., 2 T.C. 763; Home Ice Cream & Ice Co., 19 B.T.A. 762. The past credit experience of the taxpayer is a reliable criterion for measuring probable future losses. Home Ice Cream & Ice Co., supra. Although a taxpayer may not retroactively adjust annual reserve additions because unanticipated future losses disclose them to have been inadequate ( Rio Grande Building & Loan Association, 36 T.C. 657; Farmville Oil & Fertilizer Co., 30 B.T.A. 1048, affd. 78 F. 2d 83), the subsequent loss experience of a taxpayer nevertheless may properly be considered as additional evidence tending either to substantiate the reasonableness or demonstrate the unreasonableness *29 of its method of computing annual additions to its bad debt reserve. Apex Brewing Co., 40 B.T.A. 1110; Black Motor Co., 41 B.T.A. 300, affd. 125 F. 2d 977; Shield Co., supra; Proctor Shop, Inc., supra.Since for years prior to 1950 the loss experience of petitioner on bad debts amounted to approximately 10 percent of his credit sales, and for the years 1951 through 1955, inclusive, his loss experience averaged 10.7 percent of charge sales, his credit experience both prior to the years in issue as well as throughout those years appears clearly to support the reasonableness of the reserve additions in question which were computed on the basis of 10 percent of annual credit sales. During the 3 years here involved a total of $376,104.32 in worthless receivables was written off against opening reserves totaling $370,280.63. Petitioner's addition to his reserve at the close of 1952 created an opening balance for 1953 of $120,254.56. Actual bad debt losses charged off against the 1953 reserve balance amounted to $99,388.59, or slightly more than 82 percent of the 1953 reserve. Petitioner's addition to his reserve at *30 the end of 1953 in the amount of $185,110.98, plus recoveries in 1953 on accounts previously charged off, created an opening bad debt reserve for 1954 of $209,641.62. Against this amount he charged $248,725.87 in bad debts which became worthless in 1954. Thus, the reserve addition made at the close of 1953 was too small to create an adequate bad debt reserve for 1954. The reserve addition of $218,152.52 made by petitioner in 1954, together with recoveries in 1954 on accounts previously charged off as worthless, less the reserve deficit, $39,084.25, created an opening reserve balance for 1955 of $211,763.51. Bad debts actually charged off in 1955 amounted to $207,121.23. Consequently, approximately 98 percent of petitioner's closing reserve for 1954 was utilized in absorbing bad debt losses occurring during the following year. Accordingly, petitioner's loss experience during the years in question serves to confirm the accuracy and reasonableness of the additions made to his bad debt reserve during 1952, 1953, and 1954. The respondent's principal contentions are based upon his regulations which provide that the determination of whether an amount constitutes a reasonable addition to *31 a reserve for bad debts depends upon a variety of factors: (2) What constitutes a reasonable addition to a reserve for bad debts must be determined in the light of the facts, and will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. In case subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve should be reflected in the determination of the reasonable addition necessary in the taxable year. A taxpayer using the reserve method should make a statement in his return showing the volume of his charge sales (or other business transactions) for the year and the percentage of the reserve to such amount, the total amount of notes and accounts receivable at the beginning and close of the taxable year, and the amount of the debts which have become wholly or partially worthless and have been charged *32 against the reserve account. [Regs. 118, sec. 39.23(k)-5(a)(2).] The respondent relies primarily upon that portion of the above-quoted paragraph of his regulations which states that reasonableness of an addition to a reserve for bad debts "will depend primarily upon the total amount of debts outstanding as of the close of the taxable year." The respondent argues that, in violation of the foregoing provision of his regulations, the additions petitioner made to his bad debt reserve for the years in issue were noticeably disproportionate to his total outstanding accounts receivable for each of those years. Respondent contends that petitioner had accounts receivable outstanding at the close of 1952 in the amount of $115,744.15, as compared with a bad debt reserve amounting to $120,254.56, which actually was larger than his total accounts receivable. Respondent arrived at the amount he claims represents Lee Optical's total 1952 year-end accounts receivable ($115,744.15) by adding the figure carried on the books of the separately located Lee stores as accounts outstanding at the close of 1952 ($31,867.05) and the amounts carried as outstanding accounts receivable due from Zale ($45,812.50) *33 and Gordon's ($38,064.60), which amounts the parties have stipulated actually represent accounts due from those stores for one month only, viz., December 1952. For 1953 the respondent claims that petitioner's outstanding accounts receivable totaled approximately $126,000 as compared with an addition to his bad debt reserve for that year of $185,110.98, which brought the reserve balance for 1953 to $209,641.62. Again for 1954 the respondent's position is that petitioner had outstanding accounts receivable at the end of that year in the amount of $169,332.44 but made an addition to his bad debt reserve of $218,152.52 at the close of 1954. On this basis the respondent contends that petitioner's annual additions to his bad debt reserve bore no relation whatever to his outstanding accounts receivable. The total outstanding year-end accounts receivable of Lee Optical for any of the years 1952, 1953, and 1954 are not disclosed by the record. Only the outstanding accounts receivable resulting from sales in separately located Lee Optical stores are shown. Of the approximately 75 optical stores operated by petitioner during the years in issue, only 28 were separately located outlets. Thirty-two *34 of the petitioner's stores were located on the premises of Zale Jewelry Company and 14 were located in Gordon's Jewelry Company. The accounts receivable figures utilized by the respondent in support of his argument that petitioner's annual additions bore no relation to his outstanding accounts receivable do not include any part of the outstanding accounts resulting from sales in the approximately 46 Lee Optical Company stores located on the premises of Zale and Gordon's. The respondent further contends, however, that the accounts receivable resulting from sales in stores located in Gordon's and in Zale did not actually belong to petitioner and that he accordingly is not entitled to deduct additions to a reserve created to absorb losses arising therefrom. He also maintains that for purposes of comparing petitioner's outstanding accounts to his bad debt reserve, we should disregard accounts representing credit sales made through Gordon's and Zale. These contentions are based upon the facts that Zale and Gordon's agreed with petitioner to handle the billing and collections on credit sales and, further, that the lease executed by Carp and Gordon's Jewelry Company in 1952 reserved to *35 Gordon's the right to determine when an account became uncollectible and also provided that all accounts receivable resulting from credit sales made through stores located on its premises would become its exclusive property. We are unable to agree with respondent that this record indicates a disposition by petitioner of his accounts receivable to Zale and Gordon's. An examination of the leases executed by the parties discloses that at the time of their execution Zale and Gordon's intended neither to share in the profits of petitioner nor to purchase his accounts receivable but to collect rent in return for providing store space, bookkeeping facilities, collection services, and other services. We find no dispositive language in either agreement clearly effecting a sale, exchange, or assignment of accounts by Carp to Gordon's or Zale. Both the form and the substantive provisions of these agreements characterize them as leases of commercial space and, in a secondary sense, as service contracts, not as sales contracts. Neither are they shown to be merely contracts of indemnity whereby petitioner was made a guarantor of the credit sales to be made through Gordon's and Zale. Petitioner's *36 lease with Zale specifically recognizes his continued ownership of the accounts, for it refers to the receivables in question as "the accounts of Second Party [Carp]." The facts that petitioner was to receive 80 percent of the gross sales made through Gordon's or Zale, that Lee Optical was to be "charged" with all worthless accounts resulting from sales made through either of those stores, that Lee's employees on Gordon's premises actually determined whether or not credit would be extended to a Lee customer, and that the parties consistently followed the practice of jointly deciding as between representatives of Lee and Gordon's or Zale and Lee as to whether or not a particular account should be charged off as worthless, further indicate that petitioner still retained his property interest in the accounts arising from sales made in those stores. It is perhaps significant also that there is no indication in the record that either petitioner or Gordon's attempted at any time to protect themselves from the possibility of claims on the part of a subsequent purchaser of the accounts receivable by filing with the County Clerk a "Notice of Assignment," as they might have done under Texas *37 law. Tex. Civ. Stat. Ann. art. 260-1. It is true that the provision in the lease executed in 1952 by petitioner and Gordon's to the effect that all accounts receivable resulting from credit sales made through stores located on its premises were to become its (Gordon's) exclusive property appears to be inconsistent with the retention of those accounts by petitioner. However, we are of the opinion, on the record, that this provision refers solely to the retention of the account cards by Gordon's, not to the ownership of the accounts themselves. Each account card contained the name of a customer and credit information as to his jewelry purchases from Gordon's, as well as information on his optical purchases from petitioner. If Lee Optical were to retain such cards, Gordon's would have no way to prevent Lee from disclosing such sales and credit information to Zale (which was in close competition with Gordon's) or to another competitor. Zale and Gordon's each had retail outlets in a number of the same cities in Texas. Gordon's apparently felt this particular lease provision to be necessary in order to protect its customer lists. In any event, even though the lease agreement between *38 petitioner and Gordon's is construed as constituting a transfer of Lee accounts to Gordon's, it is clear to us that the parties intended such transfer to be by way of security only and for the purpose of granting Gordon's a pledge for the payment of rent. By thus acquiring petitioner's accounts, Gordon's would be able to service and collect the accounts as its own, issue its own receipt, and, if it so desired, bring suit in its own name. Such a pledge by petitioner of his accounts would not deprive him of the substantial ownership thereof for tax purposes. Cf E. J. Murray, 21 T.C. 1049, affd. 232 F. 2d 742; Pittsburg Canners, Inc., 41 B.T.A. 467. Since, as we view the record herein, petitioner has shown that he did not transfer his accounts to Gordon's or Zale, he is entitled to deduct additions to a bad debt reserve of sufficient size to absorb losses arising from sales made through those stores. Further, any comparison involving petitioner's outstanding accounts should properly include accounts representing credit sales made through the approximately 46 Lee stores located in Zale and Gordon's. Although petitioner has not established the *39 amount of his total outstanding accounts receivable for any of the years in issue, he has shown that the volume of those accounts was greatly in excess of the amount utilized by the respondent in support of his argument that petitioner's reserve account was disproportionate to his total receivables. In addition, as previously noted, petitioner has shown other factors tending to establish the reasonableness of the annual additions made by him to his reserve for the years in question. The final contention advanced by the respondent is that petitioner's charge-off policy with respect to sales made in separately located Lee Optical stores was excessive in 1954. This contention is based primarily upon the fact that petitioner recovered in 1955 an unusually large number of previously charged-off accounts. Recoveries in 1955 amounted to $75,788.10. This amount was added by petitioner to his closing bad debt reserve for 1955, a year not involved in this proceeding, and would affect the reasonableness of his addition for that year only. The reason petitioner was able to achieve particular success during 1955 in recovering debts previously charged off is the fact that during 1954 Lee Optical *40 Company hired a credit manager who completely revised petitioner's collection methods. The results of his more efficient credit procedures were reflected in 1955. In further support of the respondent's argument that petitioner's charge-off policy in 1954 was excessive, he points to the testimony of an examining revenue agent who made a "spot check" of 126 out of 10,000 outstanding accounts in one of petitioner's stores, and a check of 77 out of 5,700 outstanding accounts in another. According to the report of respondent's agent made on the basis of this check in connection with his audit of petitioner's returns for 1953, Lee Optical Company's collections on accounts previously charged off in separately located Lee stores ranged from approximately 32 percent to nearly 57 percent. This report, according to respondent, is indicative of an excessive charge-off policy in petitioner's separately located Lee Optical Company stores. In view of the scant random sampling on the part of the respondent's agent, which included only two stores out of approximately 28 separately located Lee Optical outlets operating during the years in issue and involved a check of only a very few of the many accounts *41 outstanding on the books of those two stores, and in view of the fact that the agent's audit related only to the year 1953, we cannot agree with the respondent that the evidence indicates that an excessive charge-off policy was employed by petitioner in the separately located Lee Optical stores during 1954. The agent who made this investigation testified that his spot check was insufficient to demonstrate a trend and would not suffice as a basis upon which to form a valid conclusion concerning petitioner's charge-off policy. In disallowing any addition by petitioner to his reserve for bad debts at the close of 1952, the respondent's determination would allow an opening reserve for 1953 in the amount of $16,511.47. Petitioner's bad debt losses during 1953 amount to $99,388.59. His recoveries in 1953 on previously charged off bad debts totaled $3,664.67. Thus, after crediting the reserve account as computed by respondent with recoveries realized during 1953, the respondent's method of computation would result in a grossly inadequate reserve for that year, leaving a deficit in the bad debt reserve of $79,212.45. Respondent's determination for 1954 allows petitioner an opening reserve *42 of $2,883.32 against which he would charge off worthless accounts amounting to $220,117.46, after subtracting recoveries, leaving a deficit of $217,234.14. The respondent's method of computing petitioner's closing bad debt reserve for 1954 would leave him with an opening reserve for 1955 of only $1,224.04, against which he would have charged off losses amounting to $207,121.23. Recoveries made during 1955 in the amount of $75,788.10 would reduce to $131,333.13 the deficit in the reserve account as computed by the respondent's method. We are unable from this record by the application of section 23(k) of the 1939 Code or section 166(c) of the 1954 Code, or the cases decided thereunder, to see any justification for the respondent's disallowance of additions sufficient to enable petitioner to create adequate reserves for the years in issue. The petitioner's method is shown by the record to be amply justified by the nature of his business, his previous loss experience, his high percentage of credit sales, and his collection techniques, and is clearly corroborated by the close correlation between his actual loss experience during the years in issue and the opening balances in his reserve *43 account for those years. Consequently, we are of the opinion that petitioner has established that the annual additions to his bad debt reserves for the years here involved were completely reasonable and, further, that he has met his burden of proving that the respondent's disallowance of those additions was unreasonable and in abuse of the discretion vested in him under section 23(k) of the 1939 Code and section 166(c) of the 1954 Code. See Coe & Co. v. Dallman, 216 F. 2d 566; Maverick-Clarke Litho Co., supra; and Southeastern Finance Co., 4 T.C. 1069, affd. on other issues 153 F. 2d 265. Petitioner's method of establishing bad debt reserves and computing annual additions thereto in his partnership stores with Shannon and Pearle was identical to the method utilized in such computations in his solely-owned stores. All pertinent facts relating to sales, accounts receivable, loss experience, and other factors bearing upon the determination of additions to the reserve in the partnership stores are substantially identical to the facts relating to those matters in the stores owned solely by Carp. We accordingly hold that the additions *44 made to the bad debt reserve during 1954 relating to the stores operated by petitioners Shannon and Carp and those operated by petitioners Pearle and Carp were likewise reasonable within the meaning of section 166(c) of the 1954 Code. Issue 2. Salary Expense Deduction Findings of Fact The books and records of Lee Optical Company disclosed $694,357.11 paid during 1953 as "salaries." In addition to the amount designated as salaries on his books, petitioner also paid during 1953 "examination fees" totaling $5,330. These amounts represented compensation for services rendered by certain optometrists employed by Carp. On their joint income tax return for 1953, Ellis and Faye Carp deducted from their gross income the amount of $699,867.09 as salaries which represented a total of the items shown as "salaries" on the books and records of Lee, plus the items described thereon as "examination fees." Due to bookkeeping errors the amount of $699,867.09 claimed by petitioners as a deduction for 1953 exceeded by $179.98 the actual total of the amounts listed on the books of Lee as "salaries" and "examination fees" paid during 1953. Respondent disallowed $4,980.93 of the total amount of $699,867.09 *45 claimed by petitioners on their joint return as salaries paid during 1953. Opinion Petitioners concede that due to bookkeeping errors the amount claimed by them as salaries for 1953 is erroneous to the extent of $179.98, but contend that the amount of $699,687.11 actually was paid out as compensation by Lee Optical Company during the year in question and is therefore properly deductible under section 23(a) of the 1939 Code. We agree with petitioners. The record is clear that Lee paid this amount as compensation during 1953, $694,357.11 of which was listed as "salaries" on its books and records and $5,330 as "examination fees." Accordingly, under section 23(a) of the 1939 Code petitioners properly deducted $699,687.11 as compensation paid during 1953. Issue 3. Supervisory Expense Deduction Findings of Fact At the close of 1953, $766.73 was accrued by petitioner on his books as compensation to Dr. McClintock who was the supervisor of one of the Lee Optical Company stores. This amount represented a percentage of the sales made in that store during 1953 and could have been withdrawn by McClintock at any time. The amount was not withdrawn by him until years subsequent to 1953. *46 Petitioner maintained his books and records on an accrual method of accounting during the years in issue. The respondent disallowed the deduction of $766.73 claimed by petitioners Ellis and Faye Carp on their joint income tax return for 1953. Opinion The amount in question represented compensation accrued on the books of Lee Optical Company at the close of 1953. This compensation was credited to one of Lee's store supervisors, Dr. McClintock, and could have been withdrawn by him at any time. Since petitioner kept his books on an accrual basis, this $766.73 amount was properly deducted under section 23(a) of the 1939 Code as compensation accrued during 1953. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: STANLEY C. PEARLE and ELSIE PEARLE, Docket No. 76364; ELLIS CARP and C. FAYE CARP, Docket No. 76365; and ROBERT K. SHANNON and IRMA A. SHANNON, Docket No. 76366.↩
2. One of the stores operated by petitioner during the years in issue was located in Gray's at Tulsa, Oklahoma.↩
3. There is no contention here, either in the pleadings or on brief, that the accounts determined to be uncollectible and worthless were not in fact worthless.↩
2. Error in addition, correct total this column is $27,989.96. ↩
1. Collections on bad debts during year 1950 added to income in year 1950 per RAR dated 12-2-52. ↩
3. Reserve transferred from a partnership whose accounts were merged into sole proprietorship.↩
4. I.R.C. 1954. SEC. 166. BAD DEBTS. * * *
(c) Reserve for Bad Debts. - In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts. ↩
5. I.R.C. 1939. SEC. 23. DEDUCTIONS FROM GROSS INCOME. * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. In the case of a mutual savings bank and having capital stock represented by shares, a domestic building and loan association, and a cooperative bank without capital stock organized and operated for mutual purposes and without profit, the reasonable addition to a reserve for bad debts shall be determined with due regard to the amount of the taxpayer's surplus or bad debt reserves existing at the close of December 31, 1951. In the case of a taxpayer described in the preceding sentence, the reasonable addition to a reserve for bad debts for any taxable year shall in no case be less than the amount determined by the taxpayer as the reasonable addition for such year; except that the amount determined by the taxpayer under this sentence shall not be greater than the lesser of (A) the amount of its net income for the taxable year, computed without regard to this subsection, or (B) the amount by which 12 per centum of the total deposits or withdrawable accounts of its depositors at the close of such year exceeds the sum of its surplus, undivided profits, and reserves at the beginning of the taxable year.↩