ARTHUR L. WINN, JR. and SADIE N. WINN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Winn v. Commissioner
Docket No. 4059-70.
United States Tax Court
T.C. Memo 1975-213; 1975 Tax Ct. Memo LEXIS 160; 34 T.C.M. (CCH) 916; T.C.M. (RIA) 75213; June 30, 1975, Filed Arthur K. Mason, for the petitioners. Shepherd S. Neville, for the respondent GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax as follows: Taxable Year
Deficiency
1963
$14,781.45
1964
21,316.82
1966
19,676.99
1967
1,613.17
*161 The years 1963 and 1964 are involved solely by reason of claims for net operating losses carried back from 1966. The issues for decision are whether advances made by Petitioner Arthur L. Winn, Jr. to Rockland Radio Corporation were business or nonbusiness bad debts worthless or partially worthless in 1966 or 1967, contributions to capital worthless in 1966, or ordinary and necessary business expenses deductible in 1966. Other adjustments made in the statutory notice of deficiency have been settled. Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts and exhibits are incorporated by this reference. Petitioners Arthur L. and Sadie N. Winn, husband and wife, filed their joint Federal income tax returns for the taxable years 1963, 1964, 1966 and 1967 with the District Director of Internal Revenue, Baltimore, Maryland. They resided in Brinklow, Maryland, at the time they filed their petition. Arthur L. Winn, Jr. (hereinafter petitioner) has been engaged in and specialized in the practice of transportation law in Washington, D.C., for 44 years and still devotes the majority of his time to the practice of law. Petitioners' son, Anthony *162 T. Winn, became active in the field of radio broadcasting in 1959 as a management trainee with station KABL in San Francisco, California. Subsequently, he was associated with station WMAL in Washington, D.C., and station WSVA in Harrisburg, Virginia. He became interested in making broadcasting a career and, in 1960, persuaded petitioner to join him in a Federal Communications Commission (FCC) application to construct and operate a radio station. Anthony Winn was without financial resources and requested petitioner's participation to demonstrate financial backing on the FCC application. Petitioners' son made a study of economic information, family income, competitive stations, growth rate and other factors in many communities throughout the United States in order to select the most desirable community. Rockland County, New York, was selected and petitioner visited Rockland County and was impressed with its prospects for growth. Aside from its prospect as a radio station site, the real estate in the county appeared to be a very promising and attractive investment to petitioner. On January 12, 1961, petitioner acquired approximately three acres of unimproved commercial property on *163 the main thoroughfare in Rockland County. This property eventually became the site for the structure housing the radio broadcast facilities, hereafter referred to as Broadcast House. Petitioner's purchase of the real property was influenced to a certain extent by his knowledge of the fact that a nationally known retail chain was planning a shopping center nearby. He also discovered that local planning authorities considered the thoroughfare to be the center of commercial retailing in the county. On May 3, 1961, petitioner executed a lease for approximately five acres for a term of 21 years at a net annual rental of $16,000, plus taxes. The five acres were adjacent to the Broadcast House property and were intended as a site for the broadcast towers, hereinafter Tower Land. On May 26, 1961, petitioner acquired five acres near the Tower Land and Broadcast House property which was referred to as the Stark Tract. An additional two acres of the Stark Tract were acquired on or about January 1, 1963. On November 3, 1960, petitioner and Anthony Winn filed an application with the FCC as a partnership to obtain a license to construct and operate a radio station in Rockland County, New York. *164 They were advised by their counsel for FCC matters that the inclusion of local interests in their application would enhance the likelihood of a successful application. Two reputable local businessmen were asked and agreed to join the venture. To this end, Rockland Radio Corporation was organized under the laws of the State of New York on May 19, 1961. The original FCC application was amended on June 6, 1961, to substitute Rockland Radio as the applicant. The original directors, officers and subscribers of the stock of Rockland Radio were as follows: No. of Shares
Subscribed at Director
Office $100 per Share
Anthony T. Winn
President
120
Arthur L. Winn, Jr.
Secretary-Treasurer
60
Jay Northrup
Vice President
30
Jacob Pesner
Vice President
30
The shares were in fact paid for in November and December 1964 and January 1965. Petitioner's plans for the Broadcast House property included the building of a two-story structure; renting the second floor to the radio station for broadcasting facilities; renting the first floor to stores and offices; and leasing approximately two-thirds of an acre of the remaining land to the radio station to provide *165 space for the wire between Broadcast House and the radio towers on Tower Land. The forecast annual net rental from the Broadcast House property was $35,000 composed of $18,000 from the second floor broadcast facilities, $2,000 for the easement for the underground wires, $15,000 from first floor rentals. The forecast net cash remaining after payment of the principal and interest on the construction mortgage and operating expenses ranged from $7,700 to $15,000. On February 17, 1964, the FCC rendered a favorable decision which became final and effective September 17, 1964. After the tentative favorable decision, Anthony Winn commenced planning for the construction of the towers, installation of the ground system and purchase of the needed equipment. On January 20, 1965, the board of directors authorized Rockland Radio to purchase a tower and transmitting equipment from Gates Radio Company for $64,462.16 composed of $22,000 in cash with the balance financed by a conditional sales contract guaranteed by petitioner and Anthony Winn. On February 5, 1965, Rockland Radio executed a loan agreement with Bankers Trust Company, guaranteed by petitioner and Anthony Winn, for a loan of $75,000 *166 to be advanced from time to time thereafter and prior to September 30, 1965, to provide working capital and for the purchase of equipment. Under the Bankers Trust loan agreement, Rockland Radio was not permitted to "[create,] incur or assume any liability for borrowed money or advances" from anyone other than petitioner nor was Rockland Radio allowed to make repayments to petitioner while the Bankers Trust obligation was outstanding. The guaranty provided that the guarantor could be called upon for payment if the borrower suspended operations. On February 18, 1965, petitioner applied to County Trust Company of Tarrytown, New York, for a construction loan of $175,000 covering the construction costs of Broadcast House. The total cost to construct Broadcast House was $224,150.24, with the amount in excess of the $175,000 construction loan supplied by petitioner personally. On June 18, 1965, petitioner leased the second floor of Broadcast House to Rockland Radio for a term of 17 years at an annual rent of $18,500. On the same day, petitioner subleased the Tower Land to Rockland Radio for a term of 18 years at an annual rent of $18,560.85 accruing from February 1, 1964. At Rockland *167 Radio's board of directors meeting on May 25, 1961, a general discussion of the financial needs of the corporation disclosed a contemplated need of $70,000 cash and $24,000 in equity capital. Petitioner agreed, if necessary, to lend the corporation $46,000. On October 17, 1964, petitioner agreed to lend the corporation $26,000. Anthony Winn's planning indicated that Rockland Radio would be self-supporting after three months of operations. Petitioner made the following advances to Rockland Radio during the years 1964 through 1967: 1964 Month
Amount
Maturity
May 1
$ 3,000.00
5/1/67
October 13
6,626.49
10/13/67
October 17
2,000.00
10/17/67
November 3
10,000.00
11/3/67
December 31
700.00
12/31/67
December 31
14,000.00
12/31/67
$ 36,326.49
1965
December 1
5,000.00
12/1/68
December 31
10,000.00
12/31/66
$ 15,000.00
1966
January 28
10,000.00
1/28/67
February 21
10,000.00
2/21/67
March 23
20,000.00
3/23/67
May 12
10,000.00
5/12/68
June 24
10,000.00
6/240/68
July 29
10,000.00
7/29/68
August 19
5,000.00
8/19/68
September 1
5,000.00
9/1/68
September 16
10,000.00
9/16/67
October 5
4,500.00
10/5/67
December 20
5,000.00
12/20/67
$ 99,500.00
$150,826.49
*168 All the advances were evidenced by notes maturing from one to three years from the date of the advance with interest at 6 percent. The 1967 advances were as follows and were also evidenced by notes: 1967 Month
Amount
January 6
$ 2,000
January 28
5,000
March 3
2,000
March 31
6,000
April 14
3,500
May 5
4,000
May 29
4,000
June 7
5,000
June 22
5,000
July 17
3,000
July 20
6,750
August 22
3,000
September 11
5,500
September 25
1,500
September 27
325
October 6
3,000
October 20
1,000
November 17
3,000
December 7
2,500
December 14
5,000
December 26
2,500
$73,575
Neither the principal nor the interest on such notes or advances was ever paid. After 1967, petitioner continued to make advances to Rockland Radio. Rockland Radio went on the air in temporary studio quarters on the Stark Tract in September 1965. Broadcast House was completed and Rockland Radio commenced occupancy in June 1966. The design of the radio antenna system for Rockland Radio by an engineering firm anticipated a broadcast reception pattern providing reception for listeners throughout Rockland County, New York. This projected broadcast reception pattern *169 was based upon ground conductivity data provided by the FCC. Upon commencement of broadcasting, it was discovered that peculiar soil conditions produced a lower ground conductivity, and, consequently, the broadcast area was less than anticipated. The same engineering firm was employed to study the situation with a view to designing and requesting FCC authorization to employ a different radio broadcasting pattern to provide greater and stronger reception as originally anticipated. A revised pattern was prepared and filed with the FCC with the request that it be authorized. Such authorization was received from the FCC in March of 1966, and the revised broadcasting pattern was used in the spring of 1966 and finally approved by the FCC in September 1966. The revised broadcasting pattern was still not as extensive or satisfactory a pattern as the original anticipated pattern. At the time the station went on the air, it had $25,000 in advance sales spread over a six-month period. However, after it went on the air and its signal problem was discovered, businessmen in the community stopped the advertising which they had previously agreed to and were very reluctant to buy any time on the station. *170 Even though the signal was substantially improved by the revised broadcast pattern, the corporation was unable to eliminate the stigma from the original signal problem. Gross revenues increased but only at the cost of great sums for sales promotion and the station continued to operate at a loss. During 1966, Rockland Radio's communications attorney advised petitioner and his son that sale of the station including the broadcasting license was, for all practical purposes, not feasible due to FCC regulations prohibiting sales within three years from the time of initial broadcast. As of December 31, 1966, a certified balance sheet for Rockland Radio disclosed assets of $145,135.06 and liabilities of $369,194.41. Petitioner was unable to find additional funds and Bankers Trust refused to lend any more money to Rockland Radio. In March of 1967, Anthony Winn's mother-in-law, Mrs. Hare, advanced $73,575 to petitioner secured by a second mortgage on Broadcast House. The loan was conditioned upon petitioner advancing the proceeds of the loan to Rockland Radio and Mrs. Hare being able to purchase the 25 percent interest in Rockland Radio owned by Mr. Pesner and Mr. Northrup. Petitioner had *171 guaranteed Messrs. Pesner and Northrup that they would not lose their $3,000 investment in Rockland Radio and the stock was purchased for $6,000 by Mrs. Hare in 1967. On December 31, 1967, a certified balance sheet for Rockland Radio disclosed assets of $121,491.06 and liabilities of $466,356.18. Both the 1966 and 1967 balance sheets listed the value of the broadcasting license to be $33,431.38, the same amount which was payable to Rockland Radio's FCC counsel for securing the license. A new manager was employed by Rockland Radio on January 1, 1968. At that time, the broadcast format was changed from "Top 40" to a new format placing emphasis on local news. The station's call letters were also changed. In a letter dated February 16, 1968, petitioner requested a personal loan of $50,000 from Bankers Trust Company, the proceeds of which he proposed to advance to Rockland Radio. He represented that he believed that the additional money and the new manager would either provide profits of $50,000 per year within two or three years or a $500,000 sales price when sold. He estimated the station's value to be $250,000 on February 16, 1968. In early July 1968, petitioner received an unsolicited *172 offer to purchase Rockland Radio's assets for $350,000 subject to certain conditions including the inspection of the financial statements. A second offer by the same individual for $275,000 was made in September after he became familiar with Rockland Radio's income statement. Rockland Radio rejected the offers because petitioner was not interested in selling. On their joint income tax return for the taxable year 1966, petitioners claimed a deduction for worthless business bad debt for advances to Rockland Radio aggregating $150,826.49. In his statutory notice of deficiency, the Commissioner determined that petitioners' claimed business bad debt for the taxable year 1966 of $150,826.49 was a contribution to capital. In the event that the advances constituted debt, he further determined that the bad debts were nonbusiness. In addition, he determined that such advances were not fully or partially worthless in the taxable year 1966. OPINION Petitioner contends that advances of $150,826.49 to Rockland Radio made from May 1, 1964 through December 20, 1966, were deductible in the taxable year 1966 or 1967 as totally worthless business bad debts under section 166(a)(1), [1] Internal *173 Revenue Code of 1954, or as partially worthless business bad debts under section 166(a)(2). He further claims the $150,826.49 as a worthless security loss under section 165(g) or as section 162 ordinary and necessary expense in carrying on his trade or business as a real estate landlord-developer in the taxable year 1966. Respondent contends that the transfers were contributions to capital rather than debt. Further, assuming the transfers gave rise to valid debt, he contends that the debt created was nonbusiness rather than business and, in any event, neither the stock nor the debts became worthless in 1966 or 1967. Petitioner has the burden of proving that either the debt, W. B. Mayes, Jr.,21 T.C. 286 (1953), or the stock, Boehm v. Commissioner,326 U.S. 287 (1945), became worthless in 1966 or 1967. It is generally accepted that a debt becomes worthless in the year in which identifiable events clearly mark the futility of any hope of recovery. Denver & Rio Grande Western Railroad Co. v. Commissioner,279 F.2d 368 (10th Cir. 1960), *174 affg. 32 T.C. 43 (1959); James A. Messer Co.,57 T.C. 848 (1972). Likewise, identifiable events evidencing the lack of liquidating or potential value determine the worthlessness of stock. United States v. S. S. Dental Manufacturing Co.,274 U.S. 398 (1927); Charles W. Steadman,50 T.C. 369 (1968), affd. 424 F.2d 1 (6th Cir. 1970), cert. denied 400 U.S. 869 (1970). Under either test, we find petitioner has failed to focus our attention on any identifiable events which are sufficiently clear to permit deduction in either 1966 or 1967. Initially, petitioner relies in part on the fact that liabilities were so far in excess of assets that there was no reasonable hope or expectation of recovery of the debt or, with respect to the stock, that it had no liquidating or potential value. Although the unsolicited offers to purchase the station's assets came in July of 1968, it is not uncommon to take cognizance of subsequent events. See, e.g., Trinco Industries, Inc.,22 T.C. 959, 965 (1954). In this instance, the certified balance sheets for December 31, 1966 and 1967, recite the value *175 of the FCC license to be $33,431.38--the cost of the legal services attributable to the acquisition of the license. Notwithstanding the fact that the FCC would not permit sale of the license until three years after it was granted, i.e., September 1968, it probably had value greater than its cost. See, e.g., Richard R. Riss, Sr.,56 T.C. 388, 409 (1971). Such a hidden value is supported by the unsolicited offer to purchase the station's assets for $350,000, subsequently reduced upon further knowledge of the offeror to $275,000 when the December 31, 1967, balance sheet listed the value of the assets at only $121,491.06. Consequently, as of December 31, 1967, with total liabilities, exclusive of notes payable to stockholders, equaling $242,954.59, we cannot find petitioner's interest in Rockland Radio, whether debt or capital, to be worthless at that time. Petitioner seeks further objective support for 1966 worthlessness from the fact that even with the improved radio signal installed in the spring of 1966, advertising and operations in general were still not profitable during the last four peak months of 1966.[2] We agree with petitioner that he is not required to *176 be an "incorrigible optimist," United States v. S. S. White Dental Manufacturing Co.,274 U.S. 398 (1927), but in the same vein, requiring clearly identifiable events discourages the premature pessimist. Petitioner provided the financial backing for Rockland Radio and its attitude toward future profitability was reflected in his acts. His continuous and sizeable advances are wholly inconsistent with worthlessness in 1966. Based upon our decision in William Purvin,6 T.C. 21 (1946), petitioner urges that dealings between a creditor and debtor subsequent to the year of claimed worthlessness do not negate the loss. William Purvin is clearly distinguishable because Purvin "made advancements in connection with a wholly different venture in a later year * * *." Purvin at 29. On the other hand, as we stated in Richard R. Riss, Sr.,supra at 408: Generally speaking, where a business, though faltering markedly, has been able to perpetuate itself as a going concern, the courts have been reluctant to hold that its debts during such a period of decline were so irredeemable as to be considered worthless. See, e.g., City National Bank, 11 B.T.A. 857 (1928), *177 appeal dismissed per curiam 35 F.2d 1016 (C.A. 8, 1929); Miriam Coward Pierson, 27 T.C. 330, 339 (1956), affd. 253 F.2d 928 (C.A. 3, 1958); Trinco Industries, Inc., 22 T.C. 959, 965 (1954); and Frank J. Shippen, supra. Even where the assets of such a business were so badly outweighed by its liabilities as to render it insolvent, the fact that it was able to struggle on as a viable concern has frequently been enough to preclude a showing of uncollectibleness. W. D. Roussel, 37 T.C. 235, 245 (1961); Miriam Coward Pierson, supra; and Trinco Industries, Inc., supra, wherein the Court held as follows: Petitioner has failed to prove the worthlessness * * * of the debt owed to it by its Canadian subsidiary in the taxable year ending June 30, 1950. * * * While losing money, and insolvent to the extent that its liabilities exceeded the book value of its assets, it was still actively engaged in business on June 30, 1950, and continued to operate for more than a year thereafter. Evidence of insolvency based on book figures does not necessarily establish the worthlessness of debts. * * * *178 [22 T.C. at 965.] In our opinion, like the facts of many of the cases cited above, the facts of the within proceeding--though compelling--are not sufficient to warrant the result sought by petitioner. Petitioner seeks to offset the inferences of potential value accompanying the advances by explaining that he feared he would lose "everything" if Rockland Radio's creditors foreclosed. We question the despair accompanying such an explanation when petitioner flatly rejected the unsolicited offer to purchase the station's assets within three months of when a sale would have been permitted under FCC regulations. We have not been directed to any circumstances indicating an identifiable event in 1967. To the contrary, Rockland Radio employed a new sales manager on January 1, 1968, and, discounting the "puffing-up" which accompanies a loan request, it cannot be denied that petitioner and, consequently, Rockland Radio were confident in his ability and the likelihood of profitable operations. Therefore, we hold that there were no identifiable *179 events in 1966 or 1967 sufficient to support a loss deduction, whether for worthless stock or for bad debt. In view of our previous holding that even if the items were debt, they did not become worthless in 1966 or 1967, the Commissioner's failure to allow a deduction for partial worthlessness under section 166(a)(2) was not arbitrary or unreasonable. Frank D. Stranahan,14 B.T.A. 1405 (1929), affd. 42 F.2d 729 (6th Cir. 1930), cert. denied 283 U.S. 822 (1931). As a final alternative contention, petitioner seeks to deduct the cash advances made in each of the taxable years as section 162 ordinary and necessary business expenses of a landlord. Assuming the expenses to be necessary, there is nothing in the record suggesting that payments by a landlord to preserve a tenant which has never been able to pay its rent were common or frequent in the real estate rental industry. Deputy v. DuPont,308 U.S. 488 (1940). Due to other concessions, Decision will be entered under Rule 155.
Footnotes
1. All Code section references are to the Internal Revenue Code of 1954 in effect during the years in issue, unless otherwise noted.↩
2. Such a result is not surprising since Rockland Radio had no sales manager for the months of July, August and September 1966.↩